McCULLOCH CORPORATION, SUCCESSOR IN INTEREST TO McCULLOCH CORPORATION AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McCulloch Corp. v. Commissioner
Docket No. 9166-77.
United States Tax Court
T.C. Memo 1984-422; 1984 Tax Ct. Memo LEXIS 255; 48 T.C.M. (CCH) 802; T.C.M. (RIA) 84422; August 7, 1984. Herbert Odell,Robert D. Comfort, and Joel C. Weiss, for the petitioner. David M. Kuchinos, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: Respondent determined a deficiency of $277,261 in petitioner's [1] Federal income tax for the taxable year ended June 30, 1969. The deficiency is the result of an adjustment made to petitioner's income for the taxable year ended June 30, 1971, that reduced petitioner's net operating loss carryback to the taxable year in issue. The issues for decision are as follows: (1) Whether an adjustment under section 951(a)(1)(B) [2] should have been made, if at all, in petitioner's taxable year ended June 30, 1970 (and certain other years), rather than in the taxable year ended June 30, 1971; and (2) whether petitioner must include in income *258 an amount under section 951(a)(1)(B) as a result of various loans made during the taxable years ended June 30, 1969 through September 30, 1973. If we decide that an adjustment in petitioner's taxable year ended June 30, 1971, is improper in any event, then we need not decide the second issue due to the particular facts of this case. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioner McCulloch Corporation (hereinafter McCulloch II) is a corporation organized under the laws of Maryland and is the successor in interest to McCulloch Corporation and Subsidiaries, (hereinafter referred to as McCulloch) a corporation organized under the laws of Wisconsin. During the taxable years here involved, [3]McCulloch was primarily engaged in the business of manufacturing and selling *259 chain saws, electric motors and gasoline engines for saws and other equipment. At the time of filing its petition in this case, petitioner had its principal place of business in Los Angeles, California. From October 1, 1973 to March 31, 1983, petitioner was a subsidiary of Black and Decker Manufacturing Company, which has its principal place of business in Towson, Maryland. During the taxable years here involved, McCulloch filed its Federal income tax returns with the District Director at Los Angeles, California and reported its income and deductions in accordance with the accrual method of accounting. During the years relevant to this case, McCulloch of Canada, Ltd. (hereinafter referred to as McCan), a Canada corporation organized in 1950, was a wholly-owned subsidiary of McCulloch. McCan had its principal place of business at Toronto, Ontario. McCan was engaged primarily in the business of distributing and selling McCulloch's chain saws and spare parts for chain saws in Canada. During the *260 years relevant to this case, McCulloch was a "United States shareholder" as defined in section 951(b) [4] and McCan was a "controlled foreign corporation," as defined in section 957(a). [5]
On August 5, 1969 and on August 19, 1969, McCulloch borrowed $500,000 from McCan (hereinafter referred to as the first *261 borrowing). For these two loans, McCulloch gave McCan two promissory notes, both of which read as follows: ON DEMAND,WE promise to pay to the order of McCULLOCH OF CANADA, LTD., * * * FIVE HUNDRED THOUSAND AND NO/100 DOLLARS, For Value received, with interest from date at the rate of 9 per cent per annum until paid. Principal and interest payable in Lawful Money of the United States at LOS ANGELES,CALIFORNIA and in case suit is instituted to collect this note or any portion thereof, WE promise to pay such additional sum as the Court may adjudge reasonable as Attorney's fees in said suit. The $1 million borrowed by McCulloch was used for working capital. Approximately eight months after the first borrowing, McCulloch proposed to the Bank of America (hereinafter Bank), its principal creditor, that McCulloch's outstanding loans with the Bank be revised.One revision was to increase a real estate loan with the Bank from an outstanding balance of $932,467.11 to $4,500,000. The proceeds of the increased loan were to be applied in part to "[t]emporarily repay McCulloch of Canada $900,000 for the period from June 15 to August 5." McCulloch also proposed *262 to decrease a loan attributable to its inventory from a balance of $3 million to $0 by December 31, 1970. The decrease would result, in part, from an anticipated renewal on August 5, 1970, of the "$900,000 loan" from McCan to McCulloch. [6] The Bank thereby financial McCulloch's repayment to McCan with the understanding that shortly thereafter McCulloch would again borrow from McCan to repay the Bank. The books and records of McCulloch reflect that on June 12, 1970, McCulloch repaid McCan $1 million plus interest (hereinafter referred to as the first repayment). The two promissory notes executed by McCulloch in August 1969 were marked "PAID IN FULL--June 12th, 1970." The funds loaned by McCan to McCulloch were acquired by McCan by borrowing from the Bank of Nova Scotia (hereinafter referred to as Nova) and from its own operations. The books and records of McCan indicate that at the time of the first borrowing, McCan increased the amount owed on its line of credit *263 with Nova by $445,000. Nova required McCan to pay off its loans with Nova each year in order to demonstrate its ability to repay. On May 31, 1970, McCan owed $500,000 on its line of credit with Nova (the then-existing limit), which balance was reduced to zero at the time of the first repayment from McCulloch. On July 13, 1970, McCulloch borrowed $1 million from McCan (hereinafter referred to as the second borrowing). McCulloch gave McCan its $1 million, payable on demand promissory note, bearing interest at the rate of nine percent per annum. Except for the date and the amount, the language of the note is identical to that of the notes of August 1969. McCulloch used $700,000 of the loan proceeds to reduce the amount owed on a line of credit that it had at the Bank. McCulloch's books and records reflect that on June 25, 1971, McCulloch repaid its then $1 million outstanding debt to McCan, with interest (hereinafter referred to as the second repayment). McCulloch's promissory note was marked "PAID IN FULL" and dated June 25, 1971. Shortly before the second repayment, McCan's line of credit with Nova showed a sum owing of $935,000. [7] McCan's books and records indicate that *264 this entire balance was paid immediately after the time of the second repayment and that McCan reborrowed $600,000 from Nova on August 4, 1971. Also on August 4, 1971, McCan loaned $1 million to McCulloch (hereinafter referred to as the third borrowing). McCulloch gave a promissory note to McCan, with terms identical in all pertinent respects to those of the prior notes. McCulloch repaid McCan $1 million plus interest (less 15 percent withholding tax) on December 21, 1971 (hereinafter referred to as the third repayment). McCulloch's promissory note was marked "PAID IN FULL" and dated December 21, 1971. Shortly before the third repayment, McCan owed $215,000 on its line of credit with Nova.This balance was reduced to zero at the time of the third repayment. During the month of January 1972 McCan borowed $130,000 from Nova. On January 5, 1972, McCan transferred $1 million to McCulloch (hereinafter referred to as the fourth borrowing). McCulloch again gave McCan a demand note identical in all pertinent respects to the prior notes. This note was marked *265 "Paid in full" and dated December 22, 1972. McCulloch's books and records reflect a $1 million payment to McCan with interest (less withholding) on December 22, 1972 (hereinafter referred to as the fourth repayment). McCulloch effectuated payment of the principal amount of the fourth borrowing through a rather complicated procedure. First it drew a check payable to McCan. This check was endorsed to the order of the Bank in order to purchase a 31-day certificate of deposit bearing interest at five and one-eighth percent payable to McCan. The certificate was purchased on the date of the fourth repayment. The Bank issued a check in the amount of $1 million dated January 22, 1973, to the order of McCan for payment of the proceeds of this certificate of deposit. This check was endorsed to McCulloch and then surrendered to the Bank in payment of a $1 million temporary loan given McCulloch by the Bank. That loan had been extended to McCulloch in order to repay McCan. [8] Through this arrangement, McCulloch repaid McCan and once again borrowed $1 million from McCan on January 23, 1983 (hereinafter referred to as the fifth borrowing). McCulloch gave McCan a promissory note identical *266 in all substantial respects to the prior notes. On the date of the fourth repayment (December 22, 1972) McCan's amount owing on its line of credit with Nova was $685,000. No payments were made to Nova during the remainder of the month of December and McCan did not again reduce the balance to zero until January 16, 1974. Approximately eight months after the fifth borrowing, McCulloch was acquired by Black and Decker Manufacturing Company (hereinafter referred to as Black and Decker). Prior to this acquisition, McCulloch was in extreme financial difficulty. After the acquisition, McCulloch became McCulloch II and Black and Decker contributed large sums of money to the company. Approximately three months after the acquisition, on January 8, 1974, McCulloch II repaid McCan $1 million, plus interest (less *267 fifteen percent withholding). The borrowings and repayments may be summarized as follows: Date Borrowed a
Amount
Date
Repaid
Interest Paid b
August 5, 1969
$500,000
June 12, 1970
August 19, 1969
500,000
June 12, 1970
c $74,226.60
July 13, 1970
1,000,000
June 25, 1971
85,808.22
August 4, 1971
1,000,000
December 21, 1971
34,520.55
January 5, 1972
1,000,000
December 22, 1972
86,547.95
January 23, 1973
1,000,000
January 8, 1974
d 24,657.53
On its Federal income tax returns for the relevant taxable years, McCulloch was required to file and did file Forms 2952, "Information Return with Respect to Controlled Foreign Corporations." Form 2952 provides space for a report of any interest received by the controlled foreign corporation as a result of transactions with the United States person filing the return. On the Forms 2952 filed by McCulloch with respect *268 to its transactions with McCan, no interest was reported on the appropriate line as having been received by McCan from McCulloch for the taxable years ended June 30, 1970, June 30, 1971, December 31, 1971, or December 31, 1972. For the taxable year ended September 30, 1973, interest in the amount of $61,890 was reported as having been received by McCan from McCulloch. McCan's income statements were also attached to the Forms 2952. On these schedules, McCan Showed the following total amounts of interest income: Amount of
Year Ended
Interest[9]
June 30, 1970
$94,767
June 30, 1971
82,099
December 31, 1971
33,866
December 31, 1972
97,286
September 30, 1973
76,150
Also on Forms 2952 filed by petitioner for each of the relevant years no amount was shown in the space required for listing "[a]mounts loaned (other than open accounts which arise and are collected in the *269 ordinary course of business)." Except for the taxable year ended September 30, 1973, no amount of indebtedness remained outstanding at the end of each taxable year. The Federal income tax returns of McCulloch for the taxable years ended June 30, 1963, June 30, 1968, June 30, 1969, and June 30, 1970, were examined by respondent. This examination was completed and respondent's findings were accepted by McCulloch on October 7, 1971. All of McCulloch's books and records prepared to date were available for inspection, including those relating to the taxable year ended June 30, 1971. The examination of McCulloch's income tax returns for the periods ended June 30, 1971, December 31, 1971, December 31, 1972, and September 30, 1973, began during 1974.The revenue agent who was responsible for making the adjustment to income in issue in this case examined the report of income tax audit changes dated October 7, 1971. At the time the revenue agent began the examination of the taxable year ended June 30, 1971, the three year statute of limitations for assessment had expired for the taxable year ended June 30, 1970. See sec. 6501(a). The earnings and profits of McCan for all relevant years *270 were as follows: Date
Earnings and Profits
June 30, 1970
$648,184
June 30, 1971
604,944
December 31, 1971
796,079
December 31, 1972
824,792
September 30, 1973
856,913
OPINION In general, under section 951(a)(1)(B), [10] a United States shareholder must include in gross income an amount that represents the controlled foreign corporation's increase in earnings invested in United States property for the taxable year. Section 956(a)(1) [11] defines the amount of earnings invested in United States property as the aggregate amount of such property held by the foreign corporation at the close of its taxable year to the extent that such amount would have constituted a dividend if it had been distributed. Section 956(a)(2) [12] provides the rules for computing the pro rata share of the increase in the earnings invested in United States property for a taxable year. Our focus in this case is on section 956(b)(1)(C), [13] which includes in the definition of United States property "an obligation of a United States person," and section 1.956-2, Income Tax Regs., which provides, in part, as follows: § 1.956-2. DEFINITION OF UNITED STATES PROPERTY.--(a) INCLUDED *271 PROPERTY--(1) IN GENERAL. For purposes of section 956(a) and § 1.956-1, United States property is * * * any property acquired * * * by a foreign corporation (whether or not a controlled foreign corporation at the time) during any taxable year of such foreign corporation beginning after December 31, 1962, which is-- * * * (iii) An obligation (as defined in paragraph (d)(2) of this section) of a United States person * * * * * * (d) DEFINITIONS-- * * * (2) OBLIGATION DEFINED. For purposes of this section, the term "obligation" includes any bond, note, debenture, certificate, bill receivable, account receivable, note receivable, open account, or other indebtedness, whether or not issued at a discount and whether or not bearing interest, except that such term shall not include-- * * * (ii) Any indebtedness (other than an indebtedness arising in connection with the sale or processing of property) which-- (a) Is collected within one year from the time it is incurred, or (b) Matures within one year from the time it is incurred but is not collected within such period solely by reason of the inability or unwillingness of the debtor to make payment within such period. *272 For purposes of (b) of this subdivision, a failure to collect an indebtedness within the one-year period will not be attributed to inability or unwillingness on the part of the debtor to make payment unless it is clearly established that the creditor has made reasonable efforts to collect such indebtedness within such period. * * * *273 The parties agree that as a result of the transfers from McCan to McCulloch, a debtor-creditor relationship existed between McCulloch and McCan during the relevant years. The parties disagree on whether the transfers represent multiple loans or a single loan for tax purposes. Petitioner contends that, for tax purposes, the transfers must be viewed as a series of loans, each of which was repaid in less than one year. Under petitioner's view, McCan did not invest earnings in United States property as defined in section 956(b)(1)(C) because section 1.956-2(d)(2)(ii)(a), Income Tax Regs., excludes from the definition of United States property any indebtedness that is collected within one year from the time it is incurred. Respondent contends that, for tax purposes, the transfers must be viewed as a single loan that was not repaid until 1974. Under respondent's view, then, McCan did invest earnings in United States property during the relevant years. Respondent also contends that the exception under section 1.956-2(d)(2)(ii)(b), Income Tax Regs., does not apply. But, the threshold issue is whether respondent made the adjustment under section 956 in the proper year, because, *274 if we hold for petitioner on this issue, we need not address the second issue for the reason explained below. Petitioner contends that the adjustment made by respondent under section 951(a)(1)(B) is erroneous because an adjustment should have been made, if at all, in the taxable year ended June 30, 1970 (and certain other years). If we accept petitioner's position, then the amount of McCan's earnings invested in United States property for the taxable year ended June 30, 1970, would have been, at most, $648,184 (the amount of McCan's earnings and profits as of June 30, 1970), while the corresponding amount for the taxable year ended June 30, 1971, would have been, at most $604,944 (the amount of McCan's earnings and profits as of June 30, 1971). See sec. 956(a)(1). Hence, if we accept petitioner's position, there could be no increase in McCan's earnings invested in United States property for the taxable year ended June 30, 1971, and, therefore, no need to address the second issue. [14] See sec. 956(a)(2). *275 We agree with petitioner that the adjustment should have been made, if at all, in the taxable year ended June 30, 1970. Respondent's deficiency determination is founded upon the theory that the entire series of transactions, beginning with the loans obtained in the taxable year ended June 30, 1970, and ending with the final repayment in January 1974 constitute, for tax purposes, one long term loan. [15] Unfortunately for respondent, though, the investment under section 956, therefore, first occurred (if at all) in the taxable year ended June 30, 1970, and the adjustment should have first been made (if at all) in the year of the first borrowing, with no adjustment in the taxable year ended June 30, 1971. *276 Respondent contends that in the case of an obligation, an investment in United States property does not come into existence until it can be determined whether the obligation will be collected within one year from the time it is incurred. Under this theory, respondent argues that the obligation (the series of borrowings) became United States property in August 1970, one month into McCan's taxable year ended June 30, 1971. According to respondent, the adjustment was then properly made in that taxable year. Respondent cites section 1.956-2(d)(2)(ii)(a), Income Tax Regs., in support of his position. We disagree. We think that the plain meaning of section 956 and respondent's own regulations preclude the result urged by respondent, and we can find no statutory or judicial authority for respondent's approach. Section 956(a)(1) provides, in part, that the amount of earnings of a controlled foreign corporation invested in United States property at the close of any year is the aggregate amount of such property held by the controlled foreign corporation at the close of the taxable year. Thus, the time to measure the amount of earnings invested in such property is at the close *277 of the taxable year, including the first taxable year that the obligation is held by the controlled foreign corporation. Nothing in the statute or the regulations requires or suggests that a postponement of the determination of the amount of earnings invested in United States property in the case of an obligation should be made in the second year of the investment. Thus, if an adjustment under section 956 is appropriate at all, the adjustment should have first been made at the close of the first taxable year ended June 30, 1970. Respondent's contention that an adjustment in another year is proper is surprising because it is inconsistent with the examples provided in section 1.956-2(c)(3), Income Tax Regs.[16] In addition, in Dougherty v. Commissioner,60 T.C. 917 (1973) and in Greenfield v. Commissioner,60 T.C. 425 (1973), affd. 506 F.2d 972 (5th Cir. 1975), the Commissioner impliedly admitted through his position that a section 956 adjustment in the first year loans are made is the proper result. *278 Respondent also contends that the adjustment was made in the proper year because petitioner should be estopped on the grounds of equitable estoppel or quasi estoppel from claiming that a section 956 adjustment, if applicable, should have been made in the taxable year ended June 30, 1970. [17]
The burden of proof in respect of an affirmative defense is upon respondent. Rule 142(a), Tax Court Rules of Practice and Procedure.Estate of Kingdon v. Commissioner,9 T.C. 838, 844 (1947). In order to prevail, respondent must prove that the elements of equitable estoppel, or its related doctrine, quasi estoppel, are present in this case. We think respondent has failed to carry his burden. The elements usually *279 required for application of the doctrine of equitable estoppel are the following: (1) Conduct amounting to a misrepresentation or concealment of a material fact; (2) actual or imputed knowledge of the misrepresentation by the party to be estopped; (3) absence of knowledge of facts by the party in whose favor estoppel is applied; (4) intention or expectation of the party to be estopped that the representation or concealment will be acted upon by the other party; (5) reliance by the party seeking the estoppel; and (6) detriment to the party seeking the estoppel resulting from his reliance. [Sangers Home for Chronic Patients, Inc. v. Commissioner,72 T.C. 105, 115 (1979); [18] citation omitted.] Respondent contends that petitioner misrepresented a material fact by showing a repayment of the initial loan on its books and records for the fiscal year ended June 30, 1970, and that petitioner concealed a material *280 fact by not reporting "$1,000,000.00 in subpart F income on its 1970 tax return." [19] We disagree.Petitioner at no time has taken the position that the loans were not repaid or that the loans constituted an investment in United States property. In fact, respondent does not even argue that the loans were not in fact repaid. Rather, respondent urges us to ignore the repayments and look at the "substance" of the transactions for tax purposes. Petitioner, however, represented on its books and records a series of borrowings and repayments. That is what actually occurred.Respondent knew the facts. He merely knew them too late. [20] In the case before us, we can find no conduct by McCulloch amounting to a misrepresentation or concealment of a material fact and, therefore, no reliance by respondent upon a misrepresentation or concealment.[21] Furthermore, whether there was an increase in earnings invested in United States property is a question of law, which the parties have still not yet resolved. [22] A mutual mistake of law does not give rise to grounds for estoppel. Badger Materials, Inc. v. Commissioner,40 T.C. 725, 734 (1963), supplemental opinion 40 T.C. 1061 (1963). *281 *282 Respondent also attempts to apply a related doctrine, quasi estoppel, or duty of consistency.He asserts that this doctrine should apply even though all the technical elements of estoppel may not be present. See Continental Oil Co. v. Jones,177 F.2d 508, 512 (10th Cir. 1949). The prerequisites for application of this doctrine are as follows: (1) the taxpayer has made a representation or reported an item for tax purposes in one year, (2) the Commissioner has acquiesced in or relied on that fact for that year, and (3) the taxpayer desires to change the representation, previously made, in a later year after the statute of limitations on assessments bars adjustments for the initial tax year. [Beltzer v. United States,495 F.2d 211, 212 (8th Cir. 1974); emphasis added.] Regarding this duty of consistency, the Fifth Circuit Court of Appeals has stated as follows: To raise this duty of consistency in tax accounting we do not think a willful misrepresentation need be proven, or all the elements of a technical estoppel.It arises rather from the duty of disclosure which the law puts on the taxpayer, along with the duty of handling his accounting *283 so it will fairly subject his income to taxation. Having, though mistakenly, so represented a transaction as to defer taxation on it to a later year he ought not, when the time for taxation under his view of it comes, to be allowed to assert the tax ought to have been levied in the former year if it is then too late so to levy it. [Wichita Coca Cola Bottling Co. v. United States,152 F.2d 6, 8 (5th Cir. 1945).] Respondent contends that petitioner made a representation on its books and records for the taxable year ended June 30, 1970, that McCan's advance was repaid in that year and that now, through its argument on this issue, petitioner desires to change the original representation after the statute of limitations bars the adjustment for the fiscal year ended June 30, 1970. We do not agree with this contention. Petitioner (and respondent agrees) repaid in June 1970 the sums that were advanced in August 1969. Petitioner has never altered its reporting of these transactions. This is simply not a case of a taxpayer who has received a tax benefit due to his treatment of an item in a year barred by the statute of limitations [and who is precluded by the duty *284 of consistency] from claiming that the original treatment was incorrect and thus obtaining a tax advantage in a later year.[Unvert v. Commissioner,72 T.C. 807, 814 (1979), affd. 656 F.2d 483 (9th Cir. 1981).] Petitioner is not claiming that the position taken on its returns was incorrect. Respondent examined McCulloch's return for the year of the first borrowing, found a repayment within one year of the borrowing, but made no adjustment. Had respondent asked for and examined the subsequent year's books and records, he would have discovered the second borrowing and repayment. Respondent did in fact do this, but later, in a second examination, after the statute of limitations had expired on the prior year's return. [23] See sec. 6501(a). These facts do not warrant application of the doctrine of estoppel. Consequently, we hold for petitioner on this issue. Because of other items to which the parties previously agreed, Decision will be entered under Rule 155.
Footnotes
1. References to petitioner refer to either McCulloch Corporation or McCulloch Corporation and Subsidiaries, where applicable. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the relevant taxable years of petitioner.↩
3. Petitioner's taxable years relevant to this case are ended as follows: June 30, 1969; June 30, 1970; June 30, 1971; December 31, 1971; December 31, 1972; and September 30, 1973.↩
4. SEC. 951. AMOUNTS INCLUDED IN GROSS INCOME OF UNITED STATES SHAREHOLDERS. * * * (b) UNITED STATES SHAREHOLDER DEFINED.--For purposes of this subpart, the term "United States shareholder" means, with respect to any foreign corporation, a United States person * * * who owns * * * or is considered as owning * * * 10 percent or more of the total combined voting power of all classes of stock entitled to vote of such foreign corporation. ↩
5. SEC. 957. CONTROLLED FOREIGN CORPORATIONS; UNITED STATES PERSONS. (a) GENERAL RULE.--For purposes of this subpart, the term "controlled foreign corporation" means any foreign corporation of which more than 50 percent of the total combined voting power of all classes of stock entitled to vote is owned * * * or is considered as owned * * * by United States shareholders on any day during the taxable year of such foreign corporation.↩
6. The record in this case does not explain why the $1 million borrowing from McCan is referred to as a $900,000 loan in the correspondence with the Bank. We will continue to refer to it as a $1 million loan.↩
7. McCan's maximum line of credit must have been increased sometime between the time of the first and second repayments.↩
8. As in the case of the previous years' loans, the Bank had advanced funds to McCulloch for the fourth repayment of the loan to McCan on the condition that in the succeeding month McCulloch would reborrow funds from McCan to repay the Bank. In this case, apparently the Bank required the purchase of the certificate of deposit as a condition to financing the fourth repayment.↩
a. For the relevant taxable years of McCulloch, see supra↩ note 3, at 3. b. Amount of interest computed without taking into account 15 percent withholding. ↩
c. Interest on total of $1 million. ↩
d. This amount reflects interest from October 1, 1973 to January 8, 1974, only.↩
9. We note the discrepancy between McCulloch's books and records and McCan's income statements. No acceptable explanation has been furnished by petitioner. However, we need not resolve the discrepancies since the correct amount of interest received by McCan is not in issue.↩
10. SEC. 951. AMOUNTS INCLUDED IN GROSS INCOME OF UNITED STATES SHAREHOLDERS. (a) AMOUNTS INCLUDED.-- (1) IN GENERAL.--If a foreign corporation is a controlled foreign corporation for an uninterrupted period of 30 days or more during any taxable year beginning after December 31, 1962, every person who is a United States shareholder (as defined in subsection (b)) of such corporation and who owns (within the meaning of section 958(a)) stock in such corporation on the last day, in such year, on which such corporation is a controlled foreign corporation shall include in his gross income, for his taxable year in which or with which such taxable year of the corporation ends-- * * * (B) his pro rata share (determined under section 956(a)(2)) of the corporation's increase in earnings invested in United States property for such year * * *. ↩
11. SEC. 956. INVESTMENT OF EARNINGS IN UNITED STATES PROPERTY. (a) GENERAL RULES.--For purposes of this subpart-- (1) AMOUNT OF INVESTMENT.--The amount of earnings of a controlled foreign corporation invested in United States property at the close of any taxable year is the aggregate amount of such property held, directly or indirectly, by the controlled foreign corporation at the close of the taxable year, to the extent such amount would have constituted a dividend (determined after the application of section 955(a)) if it had been distributed. ↩
12. SEC. 956(a)(2). PRO RATA SHARE OF INCREASE FOR YEAR.--In the case of any United States shareholder, the pro rata share of the increase for any taxable year in the earnings of a controlled foreign corporation invested in United States property is the amount determined by subtracting his pro rata share of-- (A) the amount determined under paragraph (1) for the close of the preceding taxable year, reduced by amounts paid during such preceding taxable year to which section 959(c)(1) applies, from (B) the amount determined under paragraph (1) for the close of the taxable year. The determinations under subparagraphs (A) and (B) shall be made on the basis of stock owned * * * by such United States shareholder on the last day during the taxable year on which the foreign corporation is a controlled foreign corporation. ↩
13. SEC. 956 (b).UNITED STATES PROPERTY DEFINED.-- (1) IN GENERAL.--For purposes of subsection (a), the term "United States property" means any property acquired after December 31, 1962, which is-- * * * (C) an obligation of a United States person * * *↩
14. We have before us a deficiency determination for the taxable year ended June 30, 1969, resulting from a reduction of a net operating loss carryback from the taxable year ended June 30, 1971 only. Under the peculiar facts of this case, if the borrowings constituted an investment in United States property, then there would have been an increase in earnings invested in United States property in the taxable years ended June 30, 1970, December 31, 1971, December 31, 1971, and September 30, 1973, but not in the taxable year ended June 30, 1971. For a computation of increase in earnings invested in United States property, see Rev. Rul. 74-436, 1974-2 C.B. 214, as amplified by Rev. Rul. 82-170, 1982-2 C.B. 159↩.
15. Nothing in the record supports a finding that there were three loans for tax purposes (two in the fiscal year ended June 30, 1970, which were repaid in one year and one long-term loan incurred in the fiscal year ended June 30, 1971, which was finally repaid in January 1974). Such a construction of the transactions would arguably reach the same result that respondent seeks. However, respondent does not advance such an argument and, therefore, we will not consider it.↩
16. Admittedly these examples illustrate a slightly different proposition--that an obligation of a United States person with respect to which the controlled foreign corporation is a pledgor or guarantor shall constitute United States property. However, if respondent were correct in his assertions, the time↩ the obligation first arises even in these examples would be the second year and not the first year (as in the examples) that the obligation arises.
17. Petitioner made an oral motion to amend its petition at the beginning of trial of this case to raise the issue that the section 956 adjustment should have been made, if at all, in the fiscal year ending June 30, 1970. The parties agree, with the Court's concurrence, that the issue raised by petitioner in its motion to amend its petition as well as respondent's affirmative defenses of equitable estoppel and quasi estoppel are properly before the Court.↩
18. In Sangers Home for Chronic Patients,↩ we held that the taxpayers were estopped from asserting that the taxable income or losses of a corporation should have been reported as income or losses of an individual proprietorship and of a partnership.
19. We assume that respondent actually means that petitioner did not include the increase in earnings invested in United States property at the end of the taxable year, which amount would have been less than $1 million due to the amount of McCan's earnings and profits that year.See secs. 951(a)(1)(B) and 956(a). ↩
20. When McCulloch's 1970 return was being audited, all of McCulloch's books and records were available for inspection, including those relating to the taxable year ended June 30, 1970. The July 13, 1970, loan occurred over one year before the audit was completed. If respondent had thought to question any transaction the information was available to him at that time. ↩
21. Because we find that there was no misrepresentation or concealment by petitioner, whether the other elements of estoppel are present is irrelevant. ↩
22. Respondent does not rely upon the seemingly incomplete Forms 2952 filed with McCulloch's returns for the relevant taxable years. If respondent had attempted to use Forms 2952 to advance his estoppel argument, he would have had to show that all the factors for application of the doctrine were present with respect to such alleged concealment. Most of the incomplete items concerned interest income of McCan, which is not in issue. Furthermore, respondent has not shown that a loan that was repaid within one year from the date it was incurred had to be shown on Form 2952. Indeed, all of the information necessary to make a determination of whether an investment in United States property occurred in the relevant years was present in McCulloch's and McCan's books and records, which were available to respondent and were examined by respondent. The fact that the records were examined at two different times does not change the result because the manner of examining the records was solely up to respondent.↩
23. It appears that the second examination came too late for application of the mitigation provisions in section 1311, et seq.↩