149 T.C. No. 5

UNITED STATES TAX COURT

CRESTEK, INC. & SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8285-13.                    Filed July 27, 2017.

P is the parent of a group of companies that includes a number of controlled foreign corporations (CFCs). Before FY 2008 one of P's domestic subsidiaries (S1) borrowed money from the CFCs, and those loans remained outstanding throughout FY 2008 and 2009. S1 before FY 2008 also borrowed money from a Malaysian bank. CFC-1, P's Malaysian subsidiary, guaranteed this loan.

Before mid-2005 CFC-1 sold completed products to another domestic subsidiary (S2), for which S2 incurred payment obligations in the form of trade receivables. CFC-1 ceased manufacturing operations in mid-2005. The net trade receivable balance owed by S2 to CFC-1 remained constant at $7.92 million from mid-2005 through the end of FY 2009.

After mid-2005 CFC-2 assumed the manufacturing activities of CFC-1 and sold completed products to S2. The net trade receivable balance owed by S2 to CFC-2 rose from $8.87 million in the first quarter of FY 2007 to $18.41 million in the last quarter of FY 2009.

R determined that all of these transactions gave rise to investments in "United States property" under I.R.C. sec. 956(c)(1)(C) and accordingly determined that P was required to include various amounts in gross income under I.R.C. sec. 951(a)(1)(B).

1. Held:  The outstanding intercompany loan balance owed by S1 to the CFCs constituted "United States property" held by the CFCs, within the meaning of I.R.C. sec. 956(c)(1)(C), during FY 2008 and 2009.

2. Held, further, CFC-1's guaranty of S1's loan and direct or indirect pledge of assets as security for that loan constituted "United States property" held by CFC-1, within the meaning of I.R.C. sec. 956(c)(1)(C) and (d), during FY 2008 and 2009.

3. Held, further, the $7.92 million trade receivable balance owed by S2 to CFC-1, which had been outstanding for at least three years and bore no interest, was in excess of the amount that "would be ordinary and necessary" in a transaction between unrelated parties, within the meaning of I.R.C. sec. 956(c)(2)(C), to carry on their respective trades or businesses.  That trade receivable thus constituted "United States property" held by CFC-1, within the meaning of I.R.C. sec. 956(c)(1)(C), during FY 2008 and 2009.

4. Held, further, in consequence of the holdings above, P must include various amounts in gross income under I.R.C. sec. 951(a)(1)(B).

5. Held, further, there remains a material dispute of fact as to whether the trade receivable balances owed by S2 to CFC-2, which were incurred in an ongoing trade or business between those entities, were "ordinary and necessary" within the meaning of I.R.C. sec. 956(c)(2)(C), to carry on their respective trades or businesses.

Richard Joseph Sapinski, Robert Alan Stern, Jefferson H. Read, Matthew T. Noll, and John H. Dies, for petitioner.

Lisa M. Rodriguez, Paul N. Schneiderman, and Carmen N. Presinal-Roberts, for respondent.

OPINION

LAUBER, Judge:  Petitioner is the parent of a group of companies that includes a number of controlled foreign corporations (CFCs).  The Internal Revenue Service (IRS or respondent) determined that these CFCs had invested substantial amounts of untaxed earnings and profits (E&P) in "United States property" as defined in section 956(c).[1]  The IRS accordingly determined that petitioner, as the ultimate shareholder of the CFCs, was required to include in income under section 951(a)(1)(B) the amounts the CFCs had invested.  As a result of these and other determinations, the IRS determined, for petitioner's fiscal years ending June 30, 2008 (FYE 2008), and June 30, 2009 (FYE 2009), deficiencies and accuracy-related penalties under section 6662(a) and (d) as follows:

---

[1]All statutory references are to the Internal Revenue Code in effect for the tax periods at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all dollar amounts to the nearest dollar.

|  Year | Deficiency | Penalty sec. 6662(a) |
|-------|-----------|---------------------|
| FYE 2008 | $10,056,605 | $2,011,321 |
| FYE 2009 | 2,156,699 | 431,340 |

This case is currently before the Court on respondent's motion for partial summary judgment filed under Rule 121. In this motion respondent seeks judgment as a matter of law that petitioner's CFCs held investments in United States property via three sets of transactions: (1) loans extended by four CFCs to a domestic subsidiary in the form of intercompany cash advances; (2) a CFC's guaranty of a loan that a domestic subsidiary had secured from a foreign bank; and (3) loans extended by two CFCs to a domestic subsidiary in the form of trade receivables in excess of amounts that "would be ordinary and necessary," within the meaning of section 956(c)(2)(C), to carry on their respective trades or businesses.

We conclude that the first and second issues may appropriately be adjudicated summarily and that respondent is entitled to summary judgment that the intercompany loans and the loan guaranty constituted investments in "United States property" within the meaning of section 956(c)(1)(C). Owing to disputes of material fact, we conclude that the third issue may be adjudicated summarily only in part. We will accordingly grant in part and deny in part respondent's motion for partial summary judgment.

## Background

The following facts are derived from the parties' pleadings and motion papers, including the declarations and the exhibits attached thereto. Crestek, Inc. (petitioner), is a C corporation incorporated in Delaware. It had its principal place of business in New Jersey at the time it filed its petition.

Petitioner is the parent of a group of more than 40 companies that manufacture and sell ultrasonic equipment, industrial cleaning tanks, cleaning systems, ceramics, subassemblies, and wire bonding equipment. The primary markets for petitioner's products are semiconductor manufacturing companies and companies that engage in industrial testing. Petitioner and its domestic subsidiaries file a consolidated Federal income tax return. Petitioner's foreign subsidiaries during the tax periods at issue conducted operations primarily in Europe and Asia, with substantial manufacturing facilities in Malaysia.

Petitioner is the sole shareholder of the Crest Group Inc. (CGI), a Delaware corporation. CGI is the sole shareholder of one domestic subsidiary and four foreign subsidiaries. CGI's domestic subsidiary is Crest Ultrasonics Corp. (Ultrasonics). CGI's foreign subsidiaries are Crest Ultrasonics Malaysia (CUM), a Malaysian corporation; Advanced Ceramics Technology Malaysia (ACTM), a Malaysian corporation; KLN Mecasonic BV (Mecasonic), a Dutch limited liability

company; and Crest Europe ApS (Crest Europe), a Danish corporation. Crest Europe was the sole shareholder of Crest Europe GmbH (Crest Germany), a German corporation. All five foreign subsidiaries were CFCs within the meaning of section 957(a). Petitioner and CGI were United States shareholders of these CFCs within the meaning of section 951(b) because they owned (directly or indirectly) 100% of the total combined voting power of all classes of the CFCs' stock.

A.      Intercompany Loans

At various times before FYE 2008 CUM, Mecasonic, Crest Europe, and Crest Germany had made loans to CGI. Substantial balances on these loans remained outstanding throughout the tax periods at issue. The CFCs, apart from Crest Germany, extended no additional credit to CGI during FYE 2008 or 2009.

At the close of the first quarter of FYE 2008, the outstanding intercompany loan balances owed by CGI to CUM, Crest Europe, and Mecasonic were $10,619,585, $3,795,905, and $3,450,000, respectively. These balances remained constant for the seven succeeding calendar quarters. At the close of the first quarter of FYE 2008 the outstanding intercompany loan balance owed by CGI to Crest Germany was $711,467; that balance remained constant for the rest of FYE 2008. At the close of the first quarter of FYE 2009, the outstanding intercompany loan balance owed by CGI to Crest Germany was $754,155; that balance remained con-

stant for the rest of FYE 2009.  Neither petitioner nor CGI had previously included in income, for any year before FYE 2008, any portion of these outstanding loan balances.

B.     Guaranty Transaction

In February 2001 CGI borrowed $11 million from the Bank of Islam, a Malaysian bank.  This loan was structured as a "debenture," a debt instrument used to borrow for medium- to long-term periods.  As a condition of extending credit, the Bank of Islam required CGI to secure a guaranty for the loan.  CUM, one of petitioner's Malaysian CFCs, supplied the required guaranty.

Although the debenture recites that a guaranty "executed by * * * [CUM] in favour of the Bank" was attached, petitioner has been unable to produce the document by which CUM supplied its guaranty.  Thus, it is not entirely clear what assets CUM pledged directly as security for CGI's loan.  However, the debenture required CGI to pledge as security for the Bank of Islam loan "all stocks [and] shares" that CGI then owned or thereafter acquired, as well as "all the rights, titles, and interests" and "the benefits of all rights, securities, and guarantees of any nature whatsoever" that CGI then held or thereafter acquired.

The Bank of Islam loan had an outstanding balance of $10.7 million at the end of the first quarter of FYE 2008, which remained constant for the succeeding

seven calendar quarters. CUM's guaranty of this loan remained in place continuously from February 2001 through the end of FYE 2009. Neither petitioner nor CGI had previously included in income, for any year before FYE 2008, any portion of this outstanding loan balance.

C.   Trade Receivables

Before 2005 CUM purchased raw materials from Ultrasonics to use in manufacturing its products. CUM later sold its completed products to Ultrasonics and others. CUM incurred payment obligations to Ultrasonics for the raw materials and recorded these outstanding obligations as intercompany trade payables. Conversely, Ultrasonics incurred payment obligations to CUM for the completed products, and CUM recorded these outstanding obligations as intercompany trade receivables. See sec. 864(d)(3) (defining "trade or service receivable" as an "account receivable or evidence of indebtedness arising out of * * * the disposition by a related person of property described in section 1221(a)(1))."

CUM ceased its manufacturing operations sometime before June 30, 2005. During FYE 2008 and 2009 CUM had no trade payables of any kind to Ultrasonics or any other U.S. affiliate. But it had substantial trade receivables from Ultrasonics for completed products it had sold to Ultrasonics before 2006. The net trade receivable balance owed to CUM by Ultrasonics was $7,919,758 at the close

of the first quarter of FYE 2008. That balance remained constant for the succeeding seven calendar quarters. Ultrasonics had previously included $2,184,843 of these trade receivables in gross income under section 951.

After CUM ceased its manufacturing operations, those operations were transferred to ACTM, which rented manufacturing facilities from CUM. ACTM continued to purchase raw materials from Ultrasonics to use in manufacturing its products and likewise sold its completed products to Ultrasonics and others. ACTM incurred payment obligations to Ultrasonics for the raw materials and recorded these outstanding obligations as intercompany trade payables. Conversely, Ultrasonics incurred payment obligations to ACTM for the completed products, and ACTM recorded these outstanding obligations as intercompany trade receivables.

During FYE 2008 and 2009 ACTM held substantial net trade receivables from Ultrasonics for its completed product sales. The net amounts of trade receivables owed to ACTM by Ultrasonics for these tax periods, no portion of which had previously been included in petitioner's gross income, were as follows:

| Quarter ending | Outstanding balance |
|---|---|
| 6/30/2007 | $8,865,115 |
| 9/30/2007 | 10,853,581 |
| 12/31/2007 | 13,093,149 |
| 3/31/2008 | 13,958,883 |
| 6/30/2008 | 15,839,753 |
| 9/30/2008 | 16,493,261 |
| 12/31/2008 | 17,692,050 |
| 3/31/2009 | 18,032,413 |
| 6/30/2009 | 18,413,224 |

At the close of FYE 2008 and 2009 petitioner's CFCs had previously untaxed E&P, denominated in euro for the European subsidiaries and in ringgit for the Malaysian subsidiaries, as follows:

| Entity | FYE 2008 | FYE 2009 |
|---|---|---|
| Crest Europe | €2,286,604 | €184,841 |
| Mecasonic | €6,287,221 | €4,942,213 |
| Crest Germany | €7,975,109 | €7,975,109 |
| CUM | RM67,274,466 | RM5,317,186 |
| ACTM | RM45,128,721 | RM11,046,314 |

Petitioner filed timely consolidated Forms 1120, U.S. Corporation Income Tax Return, for FYE 2008 and 2009. The IRS selected petitioner's returns for examination and determined that its CFCs during FYE 2008 and 2009 had held sub-

stantial investments in United States property, which petitioner had neglected to include in gross income. As a result the IRS determined deficiencies and accuracy-related penalties as set forth above. See supra p. 4. The IRS issued petitioner a timely notice of deficiency, and it timely petitioned this Court.

## Discussion

### I.    Summary Judgment Standard

Summary judgment is intended to expedite litigation and avoid costly and unnecessary trials. See FPL Grp., Inc. & Subs. v. Commissioner, 116 T.C. 73, 74 (2001). Either party may move for summary judgment upon all or any part of the legal issues in controversy. Rule 121(a). A motion for summary judgment or partial summary judgment will be granted only if it is shown that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law. See Rule 121(b); Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 238 (2002).

The moving party bears the burden of proving that there is no genuine dispute as to any material fact. For this purpose the Court views all factual materials and inferences in the light most favorable to the nonmoving party. Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985). However, the nonmoving party "may not rest upon the mere allegations or denials" of his pleadings but instead "must set forth specific facts showing that there is a genuine dispute for trial." Rule 121(d);

see Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994).

## II.     Governing Statutory Framework

A CFC is a foreign corporation more than 50% of whose stock (in terms of voting power or value) is owned (directly, indirectly, or constructively) by United States shareholders. Sec. 957(a). A United States shareholder is a U.S. person who owns (directly, indirectly, or constructively) 10% or more of the total combined voting power of the foreign corporation's stock. Sec. 951(b). The parties agree that all of petitioner's foreign subsidiaries are CFCs and that petitioner, their sole ultimate shareholder, is a "United States shareholder" under section 951(b).

Section 951(a)(1) requires that a United States shareholder owning CFC stock on the last day of the CFC's taxable year include in gross income (among other things) "the amount determined under section 956 with respect to such shareholder for such year." Under section 956(a), the amount determined under section 956 with respect to a United States shareholder is the lesser of:

(1) the excess (if any) of

(A) such shareholder's pro rata share of the average of the amounts of United States property held (directly or indirectly) by the controlled foreign corporation as of the close of each quarter of such taxable year, over

(B) the amount of earnings and profits described in section 959(c)(1)(A) with respect to such shareholder, or

(2) such shareholder's pro rata share of the applicable earnings of such controlled foreign corporation.

"United States property" includes (among other things) "an obligation of a United States person." Sec. 956(c)(1)(C). An "obligation" generally includes "any bond, note, debenture, * * * account receivable, note receivable, open account, or other indebtedness." Sec. 1.956-2T(d)(2)(i), Temporary Income Tax Regs., 53 Fed. Reg. 22163 (June 14, 1988).

For purposes of section 956(a), a CFC "shall, under regulations prescribed by the Secretary, be considered as holding an obligation of a United States person if such * * * [CFC] is a pledgor or guarantor of such obligation." Sec. 956(d). The Secretary has issued regulations interpreting this provision. The regulations generally provide that any obligation of a U.S. person "with respect to which a * * * [CFC] is a pledgor or guarantor" shall be considered United States property held by the CFC. Sec. 1.956-2(c)(1), Income Tax Regs.; see id. subpara. (2) (providing that a CFC will be considered a guarantor if its assets "serve at any time, even though indirectly, as security for the performance of an obligation of a United States person").

"United States property" is defined to exclude specified types of property, including certain trade receivables. Section 956(c)(2)(C) provides that United States property does not include:

> any obligation of a United States person arising in connection with the sale or processing of property if the amount of such obligation outstanding at no time during the taxable year exceeds the amount which would be ordinary and necessary to carry on the trade or business of both the other party to the sale or processing transaction and the United States person had the sale or processing transaction been made between unrelated persons * * *

Whether the amount of an intercompany obligation is "ordinary and necessary" under this provision "is to be determined from all the facts and circumstances in each case." Sec. 1.956-2(b)(1)(v), Income Tax Regs.

The amount of the investment in United States property under sections 951(a)(1)(B) and 956(a) with respect to an obligation is the CFC's adjusted basis in the obligation reduced by certain liabilities. Sec. 1.956-1(e)(1), Income Tax Regs. In the case of a pledge or guaranty, the amount includible is based on "the unpaid principal amount * * * of the obligation with respect to which the * * * [CFC] is the pledgor or guarantor." Id. subpara. (2). The amount includible is reduced by any previously taxed E&P of the CFC. See secs. 951(a)(1)(B) (last clause), 959(a), (c). And it cannot exceed the United States shareholder's "pro rata share of the applicable earnings" of the CFC. Sec. 956(a)(2).

III.   Analysis

Respondent contends that petitioner's CFCs during FYE 2008 and 2009 held three sets of investments in United States property under section 956(a) that petitioner was required to include in gross income under section 951(a)(1)(B). The three sets of alleged investments were:  (1) the outstanding loan balances owed by CGI to CUM, Crest Europe, Mecasonic, and Crest Germany; (2) CUM's guaranty of the loan that CGI secured from the Bank of Islam; and (3) the outstanding trade receivables owed by Ultrasonics to CUM and ACTM.  We will address these items separately after considering petitioner's threshold arguments, which apply to all three sets of investments.

A.   Threshold Arguments

Petitioner first contends that all of respondent's adjustments are barred by the statute of limitations on assessment.  Section 6501(a) generally requires the IRS to assess a tax within three years after the filing of a return.  This three-year period begins on the due date of the return if it is timely filed or on the actual filing date if the return is filed late.  See sec. 6501(b)(1).  If the IRS issues a timely notice of deficiency and the taxpayer timely petitions this Court, the period of limitations is extended until the decision of the Court becomes final and for 60 days thereafter.  See secs. 6503(a)(1), 7481(a)(1); Zarins v. Commissioner, T.C.

Memo. 2001-68, 81 T.C.M. (CCH) 1375, 1380, <u>aff'd</u>, 37 F. App'x 747 (6th Cir. 2002).

Section 6501 sets forth several exceptions to the three-year rule, including the exception that appears in section 6501(e)(1)(B).[2] It provides: "If the taxpayer omits from gross income an amount properly includible therein under section 951(a), the tax may be assessed * * * at any time within 6 years after the return was filed."

The IRS determined in the notice of deficiency that petitioner had omitted from gross income substantial amounts properly includible therein under section 951(a)(1)(B) and section 956(a). Section 6501(e)(1)(B) thus operated to extend to six years the period of limitations on assessment. Petitioner filed its Federal income tax returns for FYE 2008 and 2009 on February 28, 2009, and March 12, 2010, respectively. The notice of deficiency was mailed to petitioner on January 16, 2013. That date is well within the six-year period specified in section 6501(e)(1)(B).

_____

[2]Section 6501(e)(1)(B) was redesignated as section 6501(e)(1)(C) in 2010 by the Hiring Incentives to Restore Employment Act, Pub. L. No. 111-147, sec. 513(a)(1), 124 Stat. at 111 (2010). For ease of reference, we will refer to section 6501(e)(1)(B) for all relevant tax periods.

Second, petitioner observes that most of the proposed section 956 inclusions are attributable to investments in United States property that the CFCs had made in tax periods before FYE 2008. In petitioner's view, the IRS was obligated to make any adjustments under section 956 for the year in which the CFCs first acquired the United States property in question, not for any later period. Petitioner cites no authority for this submission, and it has no merit.

Congress provided that the section 956 inclusion "for any taxable year" shall be determined by measuring the average amount of United States property held by a CFC "as of the close of each quarter of such taxable year." Sec. 956(a) (flush language), (1)(A). The statute does not require that the inclusion be made for the first year in which the CFC acquires its investment or that the inclusion be made for any particular year. To the contrary: The statute defines the inclusion for any particular year by reference to "the amounts of United States property held (directly or indirectly) by the controlled foreign corporation" during that year. Sec. 956(a)(1)(A) (emphasis added). Thus, where a CFC holds an item of United States property for multiple years, section 956(a) permits an inclusion in income for any one of those years.

The only relevant limitation is that a section 956 inclusion cannot be made more than once for any particular investment by a CFC in United States property.

Congress accomplished this limitation by providing that any section 956 inclusion must be reduced by previously taxed income (PTI) under section 959(c)(1)(A). Petitioner concedes that, except with respect to $2,184,843 of trade receivables, see supra p. 9, the PTI limitation of section 959(c)(1)(A) does not apply because petitioner has not previously included any amount in income on account of the CFCs' investments in United States property. With that proviso, nothing in the statute bars the IRS from making section 956 adjustments for FYE 2008 and/or 2009. Cf. McCulloch Corp. v. Commissioner, T.C. Memo. 1984-422, 48 T.C.M. (CCH) 802 (barring IRS from making an adjustment, under an earlier version of section 956, for years after the year in which the CFC made its initial investment in United States property).

Petitioner's final threshold argument is that, even if a section 956(a) inclusion is required, the Court "must redetermine petitioner's income for previous years to correctly account for current earnings and profits." Petitioner cites section 6214 for the proposition that this Court, in redetermining a deficiency for a particular year, "shall consider such facts with relation to the taxes for other years * * * as may be necessary correctly to redetermine the amount of such deficiency."

This argument, as petitioner articulates it, is misguided. Petitioner's own E&P--that is, the E&P of the U.S. parent corporation--are wholly irrelevant in

determining the proper amount of a section 956 inclusion attributable to investments in United States property by petitioner's CFCs. The entities whose tax attributes are relevant to this determination are the CFCs, not petitioner.

With respect to the CFCs, two sets of tax attributes are potentially relevant: their "applicable earnings" and their "previously taxed earnings." See secs. 956(a)(2), 959(c)(1)(A). But the parties have stipulated that the five CFCs have no PTI apart from $2,184,843 of trade receivables that was previously included in petitioner's income. And the parties have stipulated the amounts (expressed in the local currency) of each CFC's previously untaxed E&P for FYE 2008 and 2009. See supra p. 10. That being so, we do not see what "redetermination" of E&P we would be called upon to make.[3]

In sum, we conclude that none of petitioner's threshold arguments precludes us from considering the issues that respondent presents for summary judgment. We therefore proceed to address the three sets of transactions that, in respondent's view, give rise to a section 956 inclusion for FYE 2008 and/or 2009.

---

[3]To the extent that there is any uncertainty about the dollar amounts of the CFCs' previously untaxed E&P (owing to currency conversion or otherwise), that uncertainty will be resolved in later proceedings in this Court.

B. <u>Intercompany Loans</u>

At various times before FYE 2008 CUM, Crest Europe, Mecasonic, and Crest Germany had made loans to CGI, and substantial balances on these loans remained outstanding during the tax periods at issue. At of the close of the first quarter of FYE 2008, the outstanding intercompany loan balances owed by CGI to CUM, Crest Europe, and Mecasonic were $10,619,585, $3,795,905, and $3,450,000, respectively. These balances remained constant for the seven suc-ceeding calendar quarters. At the close of the first quarter of FYE 2008, the out-standing intercompany loan balance owed by CGI to Crest Germany was $711,467; that balance remained constant for the rest of FYE 2008. At the close of the first quarter of FYE 2009, the outstanding intercompany loan balance owed by CGI to Crest Germany had risen to $754,155; that balance remained constant for the rest of FYE 2009.

Petitioner does not dispute that loans in these dollar amounts were out-standing at the times stated or that the loans constituted "obligation[s] of a United States person" within the meaning of section 956(c)(1)(C). Nor does petitioner contend that these loans fall within any exception to the definition of "United States property" in section 956(c)(2). Instead, petitioner asserts that some of the loans might have been "discharged" and (alternatively) that any section 956 inclu-

sion attributable to the loans must have occurred (if at all) in a year before FYE 2008. We reject both arguments.

In its response to the motion for partial summary judgment, petitioner asserts that "the trier of fact must determine if or when those loans were discharged." But in opposing a motion for summary judgment, the nonmoving party may not rest upon mere allegations or denials but instead "must set forth specific facts showing that there is a genuine dispute for trial." Rule 121(d) (emphasis added); see Sundstrand Corp., 98 T.C. at 520. Petitioner has set forth no specific facts remotely suggesting that any of the loans has been discharged or (if a particular loan were thought to have been discharged) how that loan was discharged and when.[4]

In its declarations and discovery responses petitioner has admitted that "there have been no payments on principal for any of these loans" and that all of the loans listed above "continued to be outstanding throughout the relevant time periods ending * * * June 30, 2009." Loans that remain "outstanding" cannot have been "discharged." Petitioner has provided nothing but vague speculation on this point, unsupported by specific factual allegations of any kind. This is insuf-

---

[4]If the CFCs truly discharged CGI from its obligation on one or more loans, that would give rise to income from discharge of indebtedness under section 108 unless some exclusion applied.

ficient to withstand a properly supported motion for summary judgment. <u>Fla. Country Clubs, Inc. v. Commissioner</u>, 122 T.C. 73, 76 (2004), <u>aff'd</u>, 404 F.3d 1291 (11th Cir. 2005); <u>Camerato v. Commissioner</u>, T.C. Memo. 2002-28, 83 T.C.M. (CCH) 1147, 1151.

Petitioner's alternative argument is equally unpersuasive. To the extent petitioner contends that the IRS was obligated to make any section 956 adjustment for the year in which the CFC first extended each loan, we have already rejected that argument. <u>See</u> <u>supra</u> pp. 17-18. To the extent petitioner contends that the section 956 inclusions should be reduced by PTI under section 959, that contention is foreclosed by its admission that no portion of the loan balances was ever previously included in its gross income under section 951.

In sum, we conclude that the intercompany loan balance owed by CGI to each CFC constituted "United States property," within the meaning of section 956(c)(1)(C), held by that CFC during FYE 2008 and 2009. Subject to any applicable E&P limitations, petitioner is accordingly required by section 951(a)(1)(B) to include in gross income the following amounts: for FYE 2008, the outstanding balances owed by CGI to CUM, Crest Europe, Mecasonic, and Crest Germany at the close of the first quarter of that year; and for FYE 2009, the $42,688 increase

in the outstanding balance owed by CGI to Crest Germany at the close of the first quarter of that year.[5]

C.      Guaranty Transaction

In February 2001 CGI borrowed $11 million from the Bank of Islam, a Malaysian bank. As a condition of extending credit the bank required CGI to secure a guaranty for the loan. CUM, one of petitioner's Malaysian CFCs, supplied the required guaranty.

This loan had an outstanding balance of $10.7 million at the end of the first quarter of FYE 2008. The loan balance remained constant for the succeeding seven calendar quarters, and CUM's guarantee of the loan remained in place throughout this period. Neither petitioner nor CGI had previously included in income, for any year before FYE 2008, any portion of this outstanding loan balance.

Respondent contends that CUM, as a guarantor of the Bank of Islam loan, "is considered as holding the obligation of a United States person" under section 956(d). Respondent accordingly concludes that, in the absence of any PTI, the $10.7 million balance of that loan is includible in petitioner's gross income for FYE 2008 under section 951(a)(1)(B). See sec. 1.956-1(e)(2), Income Tax Regs.

---

[5]Given possible uncertainty as to the dollar amounts of the CFCs' applicable E&P (owing to currency conversion or otherwise), the precise amounts of the section 956 inclusions will be resolved in later proceedings in this Court.

(providing that, in the case of a guaranty or pledge, the amount of the United States property investment is "the unpaid principal amount * * * of the obligation with respect to which the * * * [CFC] is the pledgor or guarantor").

Although CUM's status as a guarantor would be sufficient to support the grant of partial summary judgment for respondent, CUM also appears to have been a "pledgor" in support of the Bank of Islam loan. See sec. 956(d). A CFC will be regarded as a "pledgor" if its assets serve directly or indirectly as "security for the performance of an obligation of a United States person." Section 1.956-2(c)(2), Income Tax Regs., provides that

> the pledge of stock of a controlled foreign corporation will be considered as the indirect pledge of the assets of the corporation if at least 66-2/3 percent of the total combined voting power of all classes of stock entitled to vote is pledged and if the pledge of stock is accompanied by one or more negative covenants or similar restrictions on the shareholder effectively limiting the corporation's discretion with respect to the disposition of assets and the incurrence of liabilities other than in the ordinary course of business.

Because petitioner was unable to produce a copy of the actual guaranty document, we do not know what assets CUM pledged directly to the Bank of Islam. But the debenture required CGI to pledge to the bank "all stocks [and] shares" that it owned, which included its 100% stock ownership interest in CUM. CGI further pledged all "rights, securities, and guarantees," as well as "the bene-

fits of all rights, securities, and guarantees of any nature whatsoever" which it then held or thereafter acquired. To the extent that this latter pledge "effectively limit[ed] * * * [CGI's] discretion with respect to the disposition of * * * [CUM's] assets and the incurrence of liabilities," the debenture contained "negative covenants or similar restrictions," see ibid., that rendered CUM an indirect "pledgor" as well as a "guarantor."

Petitioner advances against this conclusion two arguments, the gist of both being that CUM's guaranty had little or no value. Petitioner first notes that CGI had originally pledged 1,500 shares of petitioner's stock as collateral for the Bank of Islam loan. That being so, petitioner asserts that CUM's guaranty was "a meaningless gesture." According to petitioner, CUM's guaranty furnished merely a secondary form of collateral that provided no incremental security for the Bank of Islam.

At the outset we have difficulty seeing the relevance of this argument. Section 956(d) provides that a CFC shall be considered as holding an obligation of a United States person if the CFC "is a pledgor or guarantor of such obligation." Petitioner concedes that CUM was a "guarantor." Under the subpart F regime as enacted by Congress, that is the end of the inquiry. Neither section 956(d) nor the

regulations interpreting it inquire into the relative importance that the creditor attaches to the guarantee.

In any event, petitioner offers no "specific facts," see Rule 121(d), to support its assertion that the Bank of Islam regarded CUM's guarantee as "a meaningless gesture." As a Malaysian bank, the Bank of Islam may have regarded CGI's pledge of stock in a closely held U.S. company as collateral of questionable value. For reasons it deemed adequate, the Bank of Islam demanded a guaranty from a Malaysian company with Malaysian assets, and CUM duly provided that guarantee. When a bank agrees to make an $11 million loan only after securing a guaranty from a local company with local assets, it is logical to assume that the bank regards that guaranty as valuable security. Petitioner has supplied no affidavit from the Bank of Islam or other document that would support a different conclusion. Petitioner's speculation about the Bank of Islam's motivation is insufficient, without more, to overcome a well-supported motion for summary judgment. See Rule 121(d); Sundstrand Corp., 98 T.C. at 520; Dahlstrom, 85 T.C. at 820-821.

Alternatively, petitioner asserts that CUM's guaranty was worthless because "other liabilities encumbering CUM's assets exceeded the fair market value of these assets at the time CUM guaranteed the debenture." In contending that CUM was functionally insolvent, petitioner has supplied no balance sheets, income

statements, or other documentation concerning CUM's financial position at any point in time. The sole support it advances for this allegation of insolvency is the assertion in a declaration by J. Michael Goodson, its chief executive officer, that "the assets pledged in support of the guarantee had liabilities that exceeded their fair market value."

The regulations provide that a CFC will be considered a guarantor if its assets "serve at any time" as security for the performance of an obligation of a United States person. Sec. 1.956-2(c)(2), Income Tax Regs. CUM's guaranty remained in place continuously from February 2001 through June 30, 2009. Petitioner has provided no documents suggesting that the Bank of Islam ever questioned the value of CUM's collateral or demanded additional security.

The parties agree that CUM during FYE 2008 and 2009 had book assets of at least $18.5 million: $10,619,585 of loan receivables and $7,919,758 of trade receivables from its U.S. affiliates. If CUM had genuine liabilities that put its solvency into serious question, petitioner was required to "set forth specific facts showing that there is a genuine dispute for trial" on this point. See Rule 121(d); Sundstrand Corp., 98 T.C. at 520. Mr. Goodson's naked assertion of insolvency, devoid of any supporting financial or accounting data, is insufficient to do this.

In any event, it is not clear that CUM's precise financial condition is even relevant in determining whether its guaranty gives rise to an investment in United States property. Section 956(d) provides that a CFC "shall, under regulations prescribed by the Secretary, be considered as holding an obligation of a United States person if such * * * [CFC] is a pledgor or guarantor of such obligation." The regulations provide categorically, with an exception not relevant here,[6] that any obligation of a United States person with respect to which a CFC is a pledgor or guarantor "shall be considered * * * United States property" held by the CFC. See sec. 1.956-2(c)(1), Income Tax Regs.

Neither the regulations nor the examples illustrating them make any reference to the likelihood that the CFC will be called upon (or be able) to make good on its guarantee. See sec. 1.956-2(c)(3), Examples (1) and (2), Income Tax Regs. The regulations reflect the common sense proposition that a lender would not ask for, or be satisfied with, a guarantee from a person who lacked the financial capacity to provide the security that the lender desires. For tax purposes more generally,

---

[6]The exception is provided for certain conduit financing arrangements. See sec. 1.956-2(c)(1), Income Tax Regs. (cross-referencing subpara. (4)).

the courts have found valid guaranties to exist without closely scrutinizing the guarantor's assets, liabilities, or overall financial health.[7]

In short, neither the statute nor the regulations provide any support for petitioner's submission. One example in a proposed regulation did refer to the value of the pledging CFC's assets, but that reference was omitted when the regulation was finalized. Compare sec. 1.956-2(c)(3), Example (3), Proposed Income Tax Regs., 44 Fed. Reg. 23883 (Apr. 23, 1979), with sec. 1.956-2(c)(3), Example (3), Income Tax Regs. As actually promulgated, the regulations make no provision for reducing the section 956 inclusion by reference to the guarantor's financial strength.[8]

_____

[7]See, e.g., Ludwig v. Commissioner, 68 T.C. 979, 985 (1977) (holding that two essential elements are required for a valid guaranty: "(1) an undertaking or promise on the part of the guarantor and (2) a liability of the guarantor to make payment if the primary obligor fails to do so"); Perry v. Commissioner, 47 T.C. 159, 163 (1966) (defining a guaranty as "an undertaking or promise on the part of one person which is collateral to a primary or principal obligation on the part of another, and which binds the obligor to performance in the event of nonperformance by such other"), aff'd, 392 F.2d 458 (8th Cir. 1968).

[8]In August 2015 the Secretary issued proposed regulations providing guidance concerning the calculation of section 956 inclusions attributable to pledges and guaranties. See sec. 1.956-1(e)(2), Proposed Income Tax Regs., 80 Fed. Reg. 53062 (Sept. 2, 2015). One concern prompting this proposal was the possibility of multiple section 956 inclusions attributable to multiple guarantors, which could result in an aggregate inclusion exceeding the unpaid principal amount of the guarantied obligation. See ibid. The Secretary sought comments on a proposal to

(continued...)

For these reasons we conclude that CUM's guarantee of the Bank of Islam loan gave rise to an investment in "United States property" within the meaning of section 956(c)(1)(C). Section 956(d) provides that a CFC "shall * * * be considered as holding an obligation of a United States person if such * * * [CFC] is a pledgor or guarantor of such obligation." The regulations the Secretary has prescribed speak in similarly categorical terms, providing no exceptions keyed to the CFC-guarantor's financial strength. Assuming arguendo that CUM's financial strength might be relevant, petitioner has come forward with no specific facts suggesting that CUM lacked the financial capacity to provide the security the Bank of Islam desired. We accordingly hold that, subject to any applicable E&P limitations, petitioner is required by section 951(a)(1)(B) to include in gross income for FYE 2008 the $10.7 million balance of the Bank of Islam loan outstanding on that date. See sec. 1.956-1(e)(2), Income Tax Regs. (providing that, in the case of a pledge or guaranty, the amount of the United States property investment is "the

_____

[8](...continued)
allocate the unpaid principal amount of the guarantied obligation among multiple CFCs in accordance with their "credit capacities," as measured (for example) by the relative net values of their assets. Ibid. The Secretary ultimately chose not to implement this approach. This series of events is consistent with the conclusion that the financial capacity of the CFC-guarantor is not a factor under the regulations that currently exist.

unpaid principal amount * * * of the obligation with respect to which the   * * * [CFC] is the pledgor or guarantor").

   D.   Trade Receivables

Petitioner concedes that CUM and ACTM during FYE 2008 and 2009 held substantial trade receivables owed by Ultrasonics.  The receivable owed by Ultrasonics to CUM was $7,919,758 throughout this period.  The net receivables owed by Ultrasonics to ACTM grew steadily from $8,865,115 in the fourth quarter of FYE 2007 to $18,413,224 in the fourth quarter of FYE 2009.  See supra p.10.

Petitioner contends that these receivables are excepted from the definition of United States property by section 956(c)(2)(C).  This exception covers "any obligation of a United States person arising in connection with the sale or processing of property," but only if the amount of such obligation "at no time during the taxable year exceeds the amount which would be ordinary and necessary to carry on the trade or business" of both parties to the transaction, assuming that they were "unrelated persons."  Whether the volume of trade receivables held by a CFC is "ordinary and necessary" for this purpose "is to be determined from all the facts and circumstances in each case."  Sec. 1.956-2(b)(1)(v), Income Tax Regs.

Respondent contends that no receivables held by CUM or ACTM qualify for the section 956(c)(2)(C) exception.  Petitioner contends that the exception for

trade receivables presents a factual question and that material disputes of fact exist. We agree with respondent as to the receivable held by CUM but with petitioner as to the receivables held by ACTM.

Before 2005 CUM had purchased raw materials from Ultrasonics, manufactured various products, and sold the completed products to Ultrasonics and others. But CUM ceased all manufacturing operations sometime before June 30, 2005, and those operations were transferred to ACTM. From that point forward ACTM replaced CUM as petitioner's contract manufacturer. The parties have stipulated that CUM thereafter remained "in existence and has not been dissolved." As far as the record reveals, however, CUM's sole commercial activity after June 30, 2005, was renting its former manufacturing facilities to ACTM, its Malaysian sister corporation.

For a variety of reasons, we conclude that the $7,919,758 receivable held by CUM during FYE 2008 and 2009 does not qualify for the section 956(c)(2)(C) exception. Because CUM had ceased all manufacturing operations by mid-2005, all subsequent transactions involving inventory purchases and product sales occurred between ACTM and its U.S. affiliates. Petitioner does not contend that CUM engaged in any commercial transaction with any U.S. affiliate during the tax

periods at issue. CUM had no trade payables to any U.S. affiliate during this period and the dollar amount of the receivable on its books did not change.

This $7,919,758 receivable was a legacy of a business activity that CUM had terminated two years previously. While it was an obligation that originally arose "in connection with the sale or processing of property," by FYE 2008 it was simply an open account owed to CUM by its U.S. affiliates. Having lost any connection to ongoing commercial transactions, the receivable was not "ordinary and necessary" because CUM and Ultrasonics were no longer engaged in a trade or business with each other. See sec. 956(c)(2)(C).

To qualify for the statutory exception, the taxpayer must establish that the amount of the obligation does not exceed the amount that would be "ordinary and necessary to carry on the trade or business" of both parties to the transaction, if the sales or processing transaction had "been made between unrelated persons." Ibid. In commercial sales transactions between unrelated persons, vendors expect to be paid relatively promptly. The $7,919,758 receivable on CUM's books during the first quarter of FYE 2008 had been outstanding for at least three years and bore no interest. By no stretch of the imagination could this be described as "ordinary" in a sales transaction between unrelated parties. And since there were no ongoing commercial transactions between CUM and its U.S. affiliates, petitioner cannot

show that any portion of this receivable was "necessary" to facilitate the sale or processing of any property.

To overcome a well-supported motion for summary judgment, a party must set forth "specific facts showing that there is a genuine dispute for trial." Rule 121(d); see Sundstrand Corp., 98 T.C. at 520. Petitioner has set forth no "specific facts" suggesting that any portion of CUM's $7,919,758 receivable qualifies for the section 956(c)(2)(C) exception. The vague and conclusory assertion by petitioner's CEO that "the transactions and amounts exchanged between Crest Ultrasonics Corp., Crest Ultrasonics Malaysia and Advanced Ceramics Technology Malaysia were ordinary and necessary" does not suffice to create a triable issue of fact.

On the other hand, we agree with petitioner that material disputes of fact do exist as to whether the volume of trade receivables held by ACTM was "ordinary and necessary." Petitioner has supplied documents showing extensive account payable and account receivable activity between Ultrasonics and ACTM during FYE 2008 and 2009. It seems likely that the volume of ACTM's net receivables was excessive: It showed no trade payables at the end of either year, while the volume of its trade receivables steadily increased from $8,865,115 to $18,413,224. But determining the exact volume that qualified as "ordinary and necessary" de-

pends on "all the facts and circumstances in each case" and will thus require trial. See sec. 1.956-2(b)(1)(v), Income Tax Regs.

In sum, we conclude that, subject to any applicable E&P limitations, and subject to a PTI reduction of $2,184,843 on account of trade receivables previously included in petitioner's gross income, petitioner is required by section 951(a)(1)(B) to include in gross income for FYE 2008 the $7,919,758 receivable that Ultrasonics owed to CUM.  As to the balance of the trade receivables, drawing all inferences in the light most favorable to petitioner as the nonmoving party, see Dahlstrom, 85 T.C. at 821, we conclude that respondent's motion for summary judgment must be denied.

To implement the foregoing,

An order will be issued granting in part and denying in part respondent's motion for partial summary judgment.