151 T.C. No. 5

UNITED STATES TAX COURT

BARRY M. SMITH AND ROCHELLE SMITH, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14900-15.                    Filed September 18, 2018.

Ps owned, through a pair of grantor trusts and an S corporation, controlled foreign corporations (CFCs) incorporated in Hong Kong and later in Cyprus. In 2008 the Hong Kong CFC paid Ps a dividend of $12.3 million. In 2009 the Cypriot CFC paid Ps a dividend of $57.1 million. In 2009 the Cypriot CFC also canceled an account receivable owed by Ps' S corporation. That account receivable had an outstanding balance of $21.1 million when it was canceled.

R determined that the dividend paid by the Hong Kong CFC in 2008 was taxable as ordinary dividend income under I.R.C. sec. 962(d), to the extent of the difference between the amount the Hong Kong CFC had distributed to them in 2008 and the tax they had previously paid on account of prior I.R.C. sec. 951(a) inclusions to which that E&P was attributable. R next determined that the Cypriot CFC was not a "qualified foreign corporation" within the meaning of I.R.C. sec. 1(h)(11)(C)(i) and hence that the $57.1 million dividend the Cypriot CFC paid Ps in 2009 was taxable as ordinary dividend income, not as "qualified dividend income" subject to a reduced rate of

tax under I.R.C. sec. 1(h)(1). Finally, R determined that the cancellation of the account receivable balance owed to the Cypriot CFC was taxable to Ps in 2009 as a constructive dividend under I.R.C. secs. 301(c)(1), 316, and 1366.

1. Held: The Hong Kong CFC was neither a domestic corporation nor a "qualified foreign corporation" under I.R.C. sec. 1(h)(11)(C)(i). Its 2008 distribution of $12.3 million to Ps therefore was not "qualified dividend income" under I.R.C. sec. 1(h)(11)(B) but rather was taxable to them under I.R.C. sec. 962(d) at ordinary-income rates.

2. Held, further, petitioners have not established that the "act of state" doctrine applies to require that we accord dispositive effect to a residency certificate issued by the Cyprus Ministry of Finance asserting that the Cypriot CFC was a resident of Cyprus during 2009. Because there exist genuine disputes of material fact concerning the CFC's residency, summary judgment is inappropriate on the question whether the Cypriot CFC was a "qualified foreign corporation" and hence as to whether the $57.1 million dividend it paid Ps in 2009 was "qualified dividend income" under I.R.C. sec. 1(h)(11)(B)(i)(II).

3. Held, further, Ps received from the Cypriot CFC in 2009 a constructive distribution of $21.1 million that was taxable to them as a dividend under I.R.C. secs. 301(c)(1) and 316(a).

Desiree E. Fernandez, Jose M. Ferrer, Summer A. Lepree, Jeffrey L. Rubinger, and Samuel C. Ullman, for petitioners.

Jeffrey B. Fienberg, Michael S. Kramarz, Sergio Garcia-Pages, and Richard A. Rappazzo, for respondent.

## OPINION

LAUBER, <u>Judge</u>:  During 2008 and 2009 petitioners owned, through a pair of domestic grantor trusts and an S corporation, controlled foreign corporations (CFCs) incorporated in Hong Kong and later in Cyprus.  The Internal Revenue Service (IRS or respondent) determined that petitioners during these years had received actual or constructive dividends from the Hong Kong CFC and from the Cypriot CFC.  On the basis of these and other adjustments the IRS determined, for petitioners' 2008 and 2009 taxable years, deficiencies of $6,308,329 and $18,743,201, respectively.

This case is currently before the Court on cross-motions for partial summary judgment under Rule 121.[1]  These motions ask that we decide three questions:

(1) Whether a $12,307,591 dividend that the Hong Kong CFC paid petitioners in 2008 should be deemed to have been distributed by a domestic corporation, so as to be subject to a reduced rate of tax as a "qualified dividend" under section 1(h)(11)(B)(i)(I);

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect for the tax years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

(2) Whether a $57,106,892 dividend that the Cypriot CFC paid petitioners in 2009 was received from a "qualified foreign corporation," so as to be subject to a reduced rate of tax as a "qualified dividend" under section 1(h)(11)(B)(i)(II); and

(3) Whether petitioners received a constructive dividend of $21,055,123 in 2009 when the Cypriot CFC canceled a debt owed to it by petitioners' S corporation.

The parties have filed cross-motions for partial summary judgment on the first and third questions, and they agree that these questions are encumbered by no disputed issues of material fact. We agree that these two questions may appropriately be decided summarily, and we answer both questions in respondent's favor.

Petitioners seek summary judgment on the second question, and respondent opposes that motion on the ground that material factual disputes exist concerning the Cypriot CFC's residency. Petitioners urge that they are entitled to judgment as a matter of law on the theory that the "act of state" doctrine requires us to accept, as dispositive of the Cypriot CFC's status as a bona fide resident of Cyprus, a certification from the Cyprus Ministry of Finance (Ministry) to that effect. Viewing the facts and inferences drawn from them in the light most favorable to respondent as the nonmoving party, we conclude that petitioners have not established that the act of state doctrine applies. Because there exist genuine disputes of material fact

concerning the Cypriot CFC's residency, we will deny petitioners' motion for partial summary judgment on the second question.

## Background

The following facts are derived from the parties' pleadings and motion papers, the declarations and the exhibits attached thereto, and the parties' first stipulation of facts. Petitioners resided in Florida when they filed their petition.

A.    Business Structure

Beginning in 1980 petitioners owned and operated a group of domestic and foreign corporations that manufactured and sold consumer electronic products. Through a pair of grantor trusts, petitioners owned Hopper Radio of Florida, Inc. (Hopper US), an S corporation. For Federal income tax purposes, petitioners were treated as owning 100% of the stock of Hopper US, and they were thus required to take into account 100% of its income. See sec. 1361(a) and (b).

Hopper US was the sole shareholder of Memcorp, Inc. (Memcorp US), a Florida corporation. As a "qualified subchapter S subsidiary" of Hopper US, Memcorp US was treated as a disregarded entity. See sec. 1361(b)(3)(A)(i), (B). For sake of simplicity, we will refer to all transactions conducted by Memcorp US as having been conducted by Hopper US directly.

From January 1995 until November 18, 2008, Hopper US was treated as owning, through Memcorp US, all the stock of Memcorp Asia Ltd. (Memcorp HK). Memcorp HK was incorporated in Hong Kong and, from the date of its incorporation until November 18, 2008, was a CFC within the meaning of section 957(a). For subpart F purposes, Hopper US, although an S corporation, was treated as a domestic partnership, and its shareholders were "treated as partners of such partnership." See sec. 1373(a). Petitioners were accordingly required to include in their gross income, under section 702, items of income, loss, deduction, and foreign tax credit attributable to Memcorp HK (and any other CFCs that Hopper US might own).

Before the tax years at issue petitioners began winding down their active business operations. In July 2007 they sold to a third party, for $47.5 million, the operating assets of Hopper US and Memcorp HK. This left Memcorp HK with substantial cash, both from its prior operations and from the sale proceeds. Petitioners planned to have this cash distributed to them.

Petitioners hoped that the contemplated distribution could be treated as "qualified dividend income" (QDI) under section 1(h)(11)(B), which would allow the dividend to be taxed at a rate of 15% or lower. See sec. 1(h)(1), (11)(B). This would be possible only if Memcorp HK were a "qualified foreign corporation."

See sec. 1(h)(11)(B)(i)(II). But Memcorp HK's residency presented a complication in that respect. A "qualified foreign corporation" is defined to mean a company that is either "incorporated in a possession of the United States" or is "eligible for benefits of a comprehensive income tax treaty with the United States." Sec. 1(h)(11)(C)(i). Memcorp HK was not incorporated in a U.S. possession. And Hong Kong did not have an income tax treaty with the United States.[2]

Petitioners accordingly decided to move Memcorp HK to Cyprus, which did have an income tax treaty with the United States. Toward that end petitioners in August 2008 incorporated Hopper Cyprus as a subsidiary of Hopper US. From the date of its incorporation Hopper Cyprus has been a CFC within the meaning of section 957(a).

On November 18, 2008, Hopper US transferred to Hopper Cyprus all of its shares in Memcorp HK. Memcorp HK then filed with the IRS, and the IRS approved, a Form 8832, Entity Classification Election, by which Memcorp HK elected to be treated as a disregarded entity. The ultimate effect of these transactions

---

[2]Although there is an income tax treaty between the United States and the People's Republic of China, it does not cover Hong Kong, which has an independent taxation system. See Agreement for the Avoidance of Double Taxation and the Prevention of Tax Evasion With Respect to Taxes on Income, China-U.S., art. 2(1), Apr. 30, 1984, T.I.A.S. No. 12,065 (stating that the taxes to which the treaty applies are those in the United States and "in the People's Republic of China"); Notice 97-40, 1997-2 C.B. 287.

was that, as of November 18, 2008, Memcorp HK reorganized itself as Hopper Cyprus in a tax-free reorganization under section 368(a)(1)(F).

By virtue of this reorganization Hopper Cyprus inherited all the assets previously owned by Memcorp HK. These assets included (1) a large sum of cash generated from the sale of Memcorp HK's operating assets and (2) an account receivable that Hopper US had owed to Memcorp HK for many years.

B.    Prior Year Audits

The IRS examined petitioners' tax returns for 2004 and 2005, and the results of those examinations are relevant to certain issues we must address. The IRS determined that Memcorp HK during 2004 held an investment of $15,765,803 in "United States property" within the meaning of section 956(c)(1)(C) (U.S. property), which was attributable to the account receivable (mentioned above) that Hopper US owed to Memcorp HK. The IRS accordingly determined that petitioners for 2004 were required to include that amount in gross income under section 951(a)(1)(B).

Petitioners acquiesced in this determination and filed an amended return for 2004, electing the benefits of section 962 with respect to the $15,765,803 gross income inclusion. This election allowed them to treat this inclusion as if the $15,765,803 "were received by a domestic corporation." Sec. 962(a)(1). This per-

mitted petitioners to be taxed at the corporate tax rate under section 11 and thus reduced their current tax liability.[3]  The IRS accepted petitioners' election, and petitioners paid tax of $5,518,031 on the section 951(a) inclusion for 2004.

This pattern repeated itself for the 2005 tax year.  In its examination of petitioners' 2005 return, the IRS determined that Memcorp HK held during 2005 an investment of $2,612,877 in U.S. property, again attributable to the account receivable that Hopper US owed to Memcorp HK.  Petitioners again filed an amended return electing the benefits of section 962, and they paid tax of $553,058 at the section 11 corporate tax rate.

C.     Transactions During 2008 and 2009

In mid-2008, several months before its reorganization to Cyprus, Memcorp HK distributed $18,378,680 to Hopper US.  This amount equaled the sum of petitioners' section 951(a) inclusions for 2004 and 2005 ($15,765,803 + $2,612,877 = $18,378,680).  Because petitioners had elected the benefits of section 962 for both inclusions, this distribution was subject to section 962(d), captioned "Special Rule for Actual Distributions."

---

[3]Petitioners also became eligible to claim deemed-paid foreign tax credits under sections 902 and 960 for the foreign taxes paid by Memcorp HK with respect to the earnings and profits (E&P) included in petitioners' gross income. See sec. 962(a)(2).  Those credits are not at issue here.

Section 962(d) creates an exception to section 959(a)(1), which generally excludes from a U.S. shareholder's gross income a CFC's previously taxed E&P. Section 962(d) provides that, if a U.S. shareholder has elected the benefits of section 962(a) with respect to prior section 951(a) inclusions, the related E&P of the CFC, when actually distributed to the U.S. shareholder, "shall, * * * notwithstanding the provisions of section 959(a)(1), be included in gross income to the extent that such * * * [E&P] so distributed exceed the amount of tax" previously paid by the U.S. shareholder.

The total amount of tax petitioners paid on account of the 2004 and 2005 inclusions was $6,071,089 (viz., $5,518,031 + $553,058). Memcorp HK had E&P of $18,378,680 attributable to those prior inclusions, and that E&P was actually distributed to petitioners in 2008. The excess of the amount actually distributed to petitioners in 2008, $18,378,680, over the tax they had previously paid on account of the section 951(a) inclusions, $6,071,089, is $12,307,591. Petitioners have stipulated that they did not include this $12,307,591 in gross income under sections 962(d) and 702 for 2008.

At the beginning of 2009 Hopper Cyprus had, among the assets on its books, a large account receivable owed by Hopper US. This was the same open account receivable, previously held by Memcorp HK, that was the focus of the

IRS' examination of petitioners' 2004 and 2005 returns. On March 31, 2009, Hopper Cyprus wrote off $21,055,123, the then-outstanding balance of the account, thus canceling the debt that Hopper US owed to it.

D.    Cyprus Competent Authority Proceedings

On March 24, 2009, Hopper Cyprus paid a cash dividend of $57,106,892 to Hopper US. On their joint return for 2009 petitioners reported this dividend as "qualified dividend income" under section 1(h)(11)(B)(i). They based this position on the theory that Hopper Cyprus was a "qualified foreign corporation" within the meaning of section 1(h)(11)(C)(i)(II).

Petitioners alleged in their petition that Hopper Cyprus had "obtained a tax residency certificate from the Cyprus tax authorities confirming its Cyprus tax residence" during 2009. Petitioners subsequently amended their petition to allege that Hopper Cyprus had "obtained a confirmation letter of Amicorp (Cyprus) Ltd., administrators of Hopper Cyprus, confirming that Hopper Cyprus was a tax resident of Cyprus during all relevant times." In June 2016 respondent filed, and we granted, a motion to stay proceedings in this case temporarily, pending the outcome of consultations and information exchanges between the U.S. competent authority and the competent authority of the Republic of Cyprus under the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal

Evasion With Respect to Taxes on Income, Cyprus-U.S., art. 28, Mar. 19, 1984, T.I.A.S. No. 10,965 (Treaty). Respondent filed that motion to "learn the facts surrounding petitioners' request for, and Cyprus' issuance of," certificates regarding Hopper Cyprus' alleged residency in that country. The IRS received responses from the Cypriot competent authority on July 1 and November 22, 2016, and January 12, 2017, and those responses are included in the record of this case.

E.     IRS Examination

Petitioners jointly filed Forms 1040, U.S. Individual Income Tax Return, for 2008 and 2009, and the IRS selected both returns for examination. As a result of this examination the IRS determined (among other things) that:

(1) for 2008 petitioners had failed to report, as ordinary dividend income under section 962(d), the $12,307,591 difference between the amount Memcorp HK had distributed to them in 2008 and the tax they had previously paid on account of the prior section 951(a) inclusions to which that E&P was attributable;

(2) for 2009 petitioners had erred in reporting the $57,106,892 dividend from Hopper Cyprus, not as an ordinary dividend, but as "qualified dividend income" subject to a reduced rate of tax under section 1(h)(1); and

(3) for 2009 petitioners had failed to report, as a constructive dividend under sections 301(c)(1), 316, and 1366, the $21,055,123 balance of the account receivable owed by Hopper US, which Hopper Cyprus had canceled in March 2009.

On the basis of these and other adjustments, the IRS on March 10, 2015, issued petitioners a timely notice of deficiency, determining a deficiency of $6,308,329 for 2008 and $18,743,201 for 2009. Petitioners timely petitioned this Court for redetermination of these deficiencies.

## Discussion

### I. Summary Judgment Standard

Summary judgment is intended to expedite litigation and avoid costly, time-consuming, and unnecessary trials. See FPL Grp., Inc. & Subs. v. Commissioner, 116 T.C. 73, 74 (2001). Either party may move for summary judgment upon all or any part of the legal issues in controversy. Rule 121(a). A motion for summary judgment or partial summary judgment will be granted only if it is shown that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law. See Rule 121(b); Elec. Arts, Inc. v. Commissioner, 118 T.C. 226, 238 (2002).

The moving party bears the burden of proving that there is no genuine dispute as to any material fact. For this purpose the Court views all factual materials

and inferences in the light most favorable to the nonmoving party. <u>Dahlstrom v. Commissioner</u>, 85 T.C. 812, 821 (1985). However, the nonmoving party "may not rest upon the mere allegations or denials" of his pleadings but instead "must set forth specific facts showing that there is a genuine dispute for trial." Rule 121(d); see <u>Sundstrand Corp. v. Commissioner</u>, 98 T.C. 518, 520 (1992), <u>aff'd</u>, 17 F.3d 965 (7th Cir. 1994).

The parties have filed cross-motions for partial summary judgment on the first and third questions presented, evidencing their belief that these questions are encumbered by no genuine disputes of material fact. We concur in that assessment and conclude that those questions may be summarily adjudicated. As explained more fully below, we reach a different conclusion as to the second question, concerning Hopper Cyprus' residency.

## II.    Governing Statutory Framework

A CFC is a foreign corporation more than 50% of whose stock (in terms of voting power or value) is owned (directly, indirectly, or constructively) by United States shareholders (U.S. shareholders). Sec. 957(a). A U.S. shareholder is a United States person, as defined in section 957(c), who owns (directly, indirectly, or constructively) 10% or more of the total combined voting power of the CFC's stock. Sec. 951(b). The parties agree that all of petitioners' foreign subsidiaries

were CFCs at the relevant times and that petitioners were U.S. shareholders of these CFCs.

Section 951(a)(1) requires that a U.S. shareholder owning CFC stock on the last day of the CFC's taxable year include in gross income (among other things) "the amount determined under section 956 with respect to such shareholder for such year." Under section 956(a), the amount determined under section 956 with respect to a U.S. shareholder is the lesser of:

> (1) the excess (if any) of

>> (A) such shareholder's pro rata share of the average of the amounts of United States property held (directly or indirectly) by the controlled foreign corporation as of the close of each quarter of such taxable year, over

>> (B) the amount of earnings and profits described in section 959(c)(1)(A) with respect to such shareholder, or

> (2) such shareholder's pro rata share of the applicable earnings of such controlled foreign corporation.

U.S. property includes (among other things) "an obligation of a United States person." Sec. 956(c)(1)(C). An "obligation" generally includes "any bond, note, debenture, * * * account receivable, note receivable, open account, or other indebtedness." Sec. 1.956-2T(d)(2)(i), Temporary Income Tax Regs., 53 Fed. Reg. 22171 (June 14, 1988).

Section 962 sets forth an alternative taxing regime for individual U.S. shareholders who invest abroad through CFCs. Section 962(a)(1) provides that an individual U.S. shareholder may elect to be taxed on his section 951(a) inclusions at the corporate tax rates specified in sections 11 and 55. This election may also entitle the individual to claim deemed-paid foreign tax credits (FTCs) under section 960, which would otherwise be unavailable. See sec. 962(a)(2).

Section 962(d), captioned "Special Rule for Actual Distributions," provides that, upon a CFC's actual distribution of E&P previously included in a U.S. shareholder's gross income (962 E&P), that shareholder must include such distribution in gross income to the extent it exceeds the U.S. tax he previously paid with respect to the relevant section 951(a) inclusion(s). Regulations under section 962 implement this rule by bifurcating the 962 E&P into two categories: excludable 962 E&P and taxable 962 E&P. See sec. 1.962-3(b)(1), Income Tax Regs. Excludable 962 E&P equal the amount of U.S. income tax previously paid on the section 951(a) inclusions, and the remaining amounts are taxable 962 E&P. Ibid.

Sections 301 and 316 govern the characterization for Federal income tax purposes of corporate distributions of property to shareholders. If the distributing corporation has sufficient E&P, the distribution is a dividend that the shareholder must include in gross income. Secs. 301(c)(1), 316(a). If the distribution exceeds

the corporation's E&P, the excess represents a nontaxable return of capital or capital gain. Sec. 301(c)(2) and (3). A dividend may be formally declared or it may be constructive. See Boulware v. United States, 552 U.S. 421, 429-430 (2008); Truesdell v. Commissioner, 89 T.C. 1280, 1295 (1987). A constructive dividend is an economic benefit conferred upon a shareholder by a corporation without an expectation of repayment. Truesdell, 89 T.C. at 1295 (citing Noble v. Commissioner, 368 F.2d 439, 443 (9th Cir. 1966), aff'g T.C. Memo. 1965-84).

As enacted in the Jobs and Growth Tax Relief Reconciliation Act of 2003, Pub. L. No. 108-27, sec. 302, 117 Stat. at 760, section 1(h)(11) makes preferential tax rates available for QDI.[4] QDI includes dividends received during the taxable year from "domestic corporations" and "qualified foreign corporations." Sec. 1(h)(11)(B)(i). A "qualified foreign corporation" is a corporation that is "incorporated in a possession of the United States" or is "eligible for benefits of a comprehensive income tax treaty with the United States." Sec. 1(h)(11)(C)(i). Dividends that do not qualify as QDI under these provisions are subject to tax at the rates applicable to the taxpayer's ordinary income.

---

[4]During the years at issue, section 1(h)(1) set forth reduced rates of tax, generally ranging from 0% to 15%, upon an individual taxpayer's net capital gain (defined to include QDI).

III.   Analysis

A.   2008 Distribution From Memcorp HK

The first issue concerns the $12,307,591 of taxable 962 E&P that Memcorp HK distributed to petitioners in mid-2008. Petitioners now agree that this distribution was a dividend and that they were required by section 962(d) to include it in gross income. The parties' dispute concerns the character of this dividend. Noting that Memcorp HK was neither a "domestic corporation" nor a "qualified foreign corporation," sec. 1(h)(11)(B)(i), respondent contends that the dividend was taxable to petitioners at ordinary-income rates. Petitioners contend that the $12,307,591 was distributed by a "notional" domestic corporation, that the dividend thus constituted QDI under section 1(h)(11)(B)(i)(I), and that the dividend was accordingly taxable at the reduced rates specified in section 1(h)(1). We think respondent has the better side of this argument.

Memcorp HK was incorporated in Hong Kong and thus was not a "domestic corporation." Sec. 1(h)(11)(B)(i)(I); see sec. 7701(a)(4) ("The term 'domestic' when applied to a corporation * * * means created or organized in the United States or under the law of the United States or of any State[.]"). If a company is not "incorporated in a possession of the United States," moreover, it cannot be a "qualified foreign corporation" unless it is "eligible for benefits of a comprehen-

sive income tax treaty with the United States." Sec. 1(h)(11)(C)(i). Petitioners concede that there did not exist during 2008 (and does not exist to this day) any form of income tax treaty between the United States and Hong Kong. And petitioners do not contend that Memcorp HK was a resident of any other country that had a tax treaty with the United States.

Petitioners' theory for treating the $12,307,591 dividend as QDI is based on their having elected to receive the benefits of section 962. By virtue of those elections, the tax they paid on the section 951(a) inclusions was "an amount equal to the tax which would be imposed under sections 11 and 55 if such amounts were received by a domestic corporation." Sec. 962(a)(1). Petitioners likewise became entitled to deemed-paid FTCs because the prior inclusions were "treated as if they were received by a domestic corporation." Sec. 962(a)(2). And the effect of section 962(d) is to treat a subsequent distribution of taxable 962 E&P "essentially as though it was first received by the hypothetical domestic corporation * * * and then redistributed to the individual taxpayer." Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts, para. 69.12, at 69-84 (3d ed. 2005).

In essence, petitioners urge that what section 962 pretends to have occurred actually happened. By virtue of their section 962 elections, petitioners contend

that Memcorp HK's E&P "moved up" to a notional domestic C corporation, which later paid the $12,307,591 dividend as a "domestic corporation" consistently with the terms of section 1(h)(11)(B)(i)(I). We discern no support for this theory in the statute, the legislative history, the regulations, or judicial precedent.

We begin our inquiry, as we must, by considering the plain and ordinary meaning of the text Congress enacted. See, e.g., Jimenez v. Quarterman, 555 U.S. 113, 118 (2009); Rainero v. Archon Corp., 844 F.3d 832, 837 (9th Cir. 2016). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-254 (1992). "When the words of a statute are unambiguous * * * 'judicial inquiry is complete.'" Id. at 254 (quoting Rubin v. United States, 449 U.S. 424, 430 (1981)). Statutory text is ambiguous where "the ordinary and common meaning of the statutory language supports more than one interpretation." Carlson v. Commissioner, 116 T.C. 87, 93 (2001). Where "statutory language is ambiguous * * * we may consult legislative history to assist us in interpreting the language in question." Ibid.

We do not find any of the relevant statutory texts to be ambiguous. Section 1(h)(11)(B)(i) defines QDI as dividends "received * * * from" a domestic corporation or a qualified foreign corporation. Petitioners' $12,307,591 dividend was re-

ceived from Memcorp HK. A corporation is a "domestic" corporation only if it is organized in the United States or under U.S. or State law. Sec. 7701(a)(4). Because Memcorp HK was organized under the law of Hong Kong, and because Hong Kong does not have an income tax treaty with the United States, Memcorp HK was neither a domestic corporation nor a qualified foreign corporation.

Nor do we find any ambiguity in the text of section 962(a). In the case of an electing U.S. shareholder, section 962(a)(1) provides that the tax imposed on the section 951(a) inclusions "shall * * * be an amount equal to the tax which would be imposed * * * if such amounts were received by a domestic corporation." Section 962(a)(2) enables the electing shareholder to claim deemed-paid FTCs by providing that the inclusions "shall be treated as if they were received by a domestic corporation." These provisions do not create hypothetical corporations or change real-world facts. They simply provide a mechanism that enables an individual U.S. taxpayer to elect what he or she may deem more desirable tax treatment.

Both clauses quoted above are drafted in the subjunctive mood. "Clauses of this type are commonly used to express a counterfactual hypothesis." Klein v. Commissioner, 149 T.C. __, __ (slip op. at 17) (Oct. 3, 2017). For example, assume a statute providing that certain persons (green card holders, perhaps) shall be treated "as if they were citizens." In such a statute, Congress would necessarily

presume that such persons were not in fact citizens, providing merely that they should be accorded the treatment which citizens receive. See id. at __ (slip op. at 17-18).

The same logic applies here. In drafting section 962 Congress adopted the counterfactual hypothesis that the section 951(a) inclusions were received by a domestic corporation, rather than by the individual U.S. shareholder, for the sole and limited purpose of enabling that person to elect beneficial tax treatment under section 962(a). There is nothing in the statutory text to suggest that Congress intended this counterfactual hypothesis to apply for any other purpose under the Code, least of all for purposes of section 1(h)(11), which was not enacted until 41 years later.[5]

Finally, we discern no ambiguity in the text of section 962(d). It provides that the previously taxed E&P "of a foreign corporation * * * shall, when such

---

[5]Petitioners err in citing section 1.962-1(b)(2)(ii), Income Tax Regs., and two IRS field service advices (FSAs) for the proposition that section 962 establishes a fictional U.S. corporation. The regulation implements section 962(a)(2) by providing that, for deemed-paid FTC purposes, "the term 'domestic corporation' * * * shall be treated as referring" to the electing U.S. shareholder. The FSAs implement section 962(a)(1), which refers to the corporate tax "which would be imposed under sections 11 and 55," by adopting the same counterfactual hypothesis for calculating the corporate alternative minimum tax. See FSAs 200247033 and 200247034 (Aug. 16, 2002). None of these authorities suggests that this counterfactual hypothesis has any operation outside the confines of section 962.

earnings and profits are distributed," be taxed to the U.S. shareholder in a specified way. There is no reference in this provision to any corporation other than the CFC whose E&P is being distributed. The E&P to which the statute refers is the foreign corporation's E&P; there is no suggestion that this E&P has previously "moved up" to a notional domestic corporation.[6]

Petitioners seek to inject ambiguity into the statute by positing that the E&P must "move up" in order to maintain parity between individual U.S. shareholders who invest in CFCs directly and those who invest in CFCs through domestic corporations. The parity for which petitioners argue may or may not represent desirable tax policy. There is simply no textual evidence that Congress enacted petitioners' policy preference in the Code provisions we are considering.[7]

---

[6]Petitioners assert that their 2008 dividend "had to come from E&P located somewhere," that this E&P "had to leave Memcorp HK when the amounts were included by the deemed C corporation," and that the E&P at the time of the 2008 dividend "could not have been located anywhere other than with the deemed U.S. C corporation." In making these assertions petitioners are assuming what they are trying to prove. Contrary to their view, the regulations tell us where the E&P were located--namely, in Memcorp HK, which at the time of the 2008 distribution had excludable 962 E&P of $6,071,089 and taxable 962 E&P of $12,307,591. See sec. 1.962-3(b)(1), Income Tax Regs.

[7]The regulations, which closely track the statute, support a plain language interpretation of its terms. Like the statute, they clearly refer to the E&P of the CFC and to a distribution by the CFC, not by a deemed domestic entity. See sec. 1.962-3(a), Income Tax Regs.

Even if section 962 were thought ambiguous, the legislative history does not provide meaningful assistance to petitioners.  Section 962 was added to the Code as part of the original subpart F regime.  Revenue Act of 1962, Pub. L. No. 87-834, sec. 12, 76 Stat. at 1006.  At that time individuals were taxed at marginal rates as high as 91%.[8]  The Senate Finance Committee explained that the purpose of section 962 was

> to avoid what might otherwise be a hardship in taxing a U.S. individual at high bracket rates with respect to earnings in a foreign corporation which he does not receive.  This provision gives such individuals assurance that their tax burdens, with respect to these undistributed foreign earnings, will be no heavier than they would have been had they invested in an American corporation doing business abroad.  [S. Rept. No. 87-1881, at 92 (1962), 1962-3 C.B. 703, 798.]

The tax parity about which Congress expressed concern involved tax burdens "with respect to these underlined foreign earnings."  Ibid. (emphasis added).  Under subpart F, U.S. shareholders were going to be taxed currently under section 951(a)(1) even though they received no cash from the CFC.  That being so, Congress believed it might be harsh to tax them on deemed distributions "at high bracket [individual] rates" and so made available (upon election) lower bracket corporate rates.

---

[8]See Thomas L. Hungerford, Cong. Research Serv., RL33786, Individual Tax Rates and Tax Burdens:  Changes Since 1960 at CRS-6 (2007) ("The highest statutory marginal tax rate was 91% in the early 1960s.").

Congress obviously knew that individual income tax rates might change in the future. When enacting section 962, it stated its understanding that taxable 962 E&P, when actually distributed by the CFC, would be treated as "a dividend" and be taxed "at individual income tax rates." S. Rept. No. 87-1881, at 92-93, 1962-3 C.B. at 799. Congress in 1962 expressed no concern--one way or the other--about the terms on which future taxation of such dividends would occur.

Section 962 entered the Code 41 years before section 1(h)(11), and Congress in 1962 could not have expressed any intention about how these two provisions would interact. Petitioners in essence argue that a foreign corporation, which is not a "qualified foreign corporation" under section 1(h)(11)(B)(i)(II), should be deemed a "domestic corporation" under section 1(h)(11)(B)(i)(I) in any case in which a U.S. shareholder has previously made a section 962 election. Congress did not express any intention to that effect when enacting section 1(h)(11) in 2003. And even if it had done so, it did not embody that intent in the text of the statute.

"[W]here Congress knows how to say something but chooses not to, its silence is controlling." CBS, Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1226 (11th Cir. 2001) (citing Griffith v. United States (In re Griffith), 206 F.3d 1389, 1394 (11th Cir. 2000)). "[T]he fact that Congress might have acted with

greater clarity or foresight does not give courts a carte blanche to redraft statutes in an effort to achieve that which Congress is perceived to have failed to do." United States v. Locke, 471 U.S. 84, 95 (1985). Petitioners invite us to rewrite section 1(h)(11) or section 962 in a way that fills what they perceive as a statutory gap. We decline this invitation: It is not our role to "soften the clear import of Congress' chosen words" even if we think those words produce a harsh result. Locke, 471 U.S. at 95.

In sum, we hold that Memcorp HK's distribution of $12,307,591 of taxable 962 E&P to petitioners was not QDI under section 1(h)(11)(B) but rather constituted an ordinary dividend taxable at ordinary-income rates. When filing their amended returns for 2004 and 2005, petitioners made voluntary, irrevocable elections under section 962. See Dougherty v. Commissioner, 61 T.C. 719, 722-723 (1974); sec. 1.962-2(c)(2), Income Tax Regs. By making these elections petitioners got what they bargained for: immediate deemed-paid FTCs and a lower current tax rate on the section 951(a) inclusions. By requiring petitioners to forfeit in large part the benefits of section 959(a), these elections may ultimately cause them to include more gross income than they would otherwise have had to include. Unfortunately, that is sometimes how the cookie crumbles.

B.    2009 Distribution From Hopper Cyprus

The second question, like the first, involves the application of section 1(h)(11). In March 2009 Hopper Cyprus paid to Hopper US what petitioners concede was a taxable dividend of $57,106,892. The dispute again concerns the proper characterization of this dividend. Petitioners contend that Hopper Cyprus was a "qualified foreign corporation," see sec. 1(h)(11)(B)(i)(II), so that the dividend constituted QDI subject to tax at the preferential rates made available by section 1(h)(1). Respondent disputes this proposition, contending that the dividend was taxable as ordinary income.

As relevant here, a "qualified foreign corporation" is a corporation "eligible for benefits of a comprehensive income tax treaty with the United States which the Secretary determines is satisfactory for purposes of this paragraph and which includes an exchange of information program." Sec. 1(h)(11)(C)(i)(II). In 2006 the IRS published a list of income tax treaties that satisfied the statutory requirements. See Notice 2006-101, 2006-2 C.B. 930, 930-931, amplified by Notice 2011-64, 2011-37 I.R.B. 231. Section 2 of Notice 2006-101 states:

> [I]n order to be treated as a qualified foreign corporation under the treaty test, a foreign corporation must be eligible for benefits of one of the U.S. income tax treaties listed in the Appendix. Accordingly, the foreign corporation must be a resident within the meaning of such term under the relevant treaty and must satisfy any other requirements

of that treaty, including the requirements under any applicable limita-
tion on benefits provision.

The appendix to Notice 2006-101, supra, lists Cyprus as a country that has an

acceptable income tax treaty with the United States.

Article 3(1) of the Treaty provides that the term "resident of Cyprus" means

(among other things) a "Cypriot corporation." Article 2(1) defines the term "Cy-

priot corporation" as "an entity (other than a United States corporation) treated as

a body corporate for tax purposes under the laws of Cyprus, which is resident in

Cyprus for the purpose of Cypriot tax."

Article 26 sets forth limitation-on-benefits (LOB) provisions for residents of

the United States and Cyprus under the Treaty. Under article 26(1), a corporation

resident in Cyprus is entitled to benefits under the Treaty if (among other things)

75% percent of its shares are owned directly or indirectly by individual residents

of Cyprus. Because petitioners, who are U.S. residents, indirectly own 100% of

Hopper Cyprus, they concede that Hopper Cyprus is not entitled to Treaty benefits

under article 26(1).

If the terms of article 26(1) are not met, a company may still satisfy the LOB

requirements if it meets the terms of article 26(2). It provides that Treaty benefits

will not be denied if "it is determined that the establishment, acquisition and

maintenance of such person and the conduct of its operations did not have as a principal purpose obtaining benefits under the * * * [Treaty]."

Under the legal framework set forth above, Hopper Cyprus must satisfy two separate tests to be treated as a "qualified foreign corporation" during 2009: (1) it must have been a resident of Cyprus under the Treaty and (2) if it was a resident of Cyprus, its establishment and operation must not have had, "as a principal purpose," the obtaining of benefits under the Treaty. Concluding as we do that there exist genuine disputes of material fact as to whether Hopper Cyprus satisfied the first test, we need not, at this stage of the case, address the second test.

In support of their position as to residency, petitioners provided declarations from Mario Tofaros, a director of Hopper Cyprus, attaching certificates issued by the Ministry stating that Hopper Cyprus during 2008-2011 was a Cypriot resident under the Treaty. Certain facts concerning the issuance of these certificates were established, pursuant to article 28 of the Treaty, through an Exchange of Information between the U.S. and Cypriot competent authorities. See supra pp. 11-12. These facts include the following:

• At a time not disclosed by the record, Hopper Cyprus was stricken from the Cypriot registry of companies for failure to file tax returns and submit annual reports to the Cypriot Registrar of Companies (Registrar).

• For reasons not disclosed by the record, Hopper Cyprus was reinstated in the Cypriot registry of companies on May 4, 2016.

• Eight days later, on May 12, 2016, Hopper Cyprus filed Cypriot tax returns for 2008, 2009, 2010, and 2011. The returns for 2008 and 2011 were not signed.

• One day later, on May 13, 2016, Mr. Tofaros submitted to the Ministry Form T.D. 98, Tax Residency Certificate Request and Questionnaire for Legal Entities. On this form he checked the box marked "Yes" to each of the following questions: (1) "Is the company incorporated in Cyprus?" (2) "Do the Majority of the Board of Directors meetings take place in Cyprus?" (3) "Does the Board of Directors exercise control and make key management and commercial decisions necessary for the company's operations and general policies?" (4) "Are Board of Directors' minutes prepared and kept in Cyprus?" (5) "Is the majority of the Board of Directors tax residents [sic] in Cyprus?" and (6) "Do shareholders' meetings take place in Cyprus?"

• Mr. Tofaros attached to the Form T.D. 98 a certificate issued by the Registrar on May 12, 2016, stating that the other two directors of Hopper Cyprus were petitioner husband and Briantserve Ltd., and a letter from Mr. Tofaros to the Ministry dated May 13, 2016, stating that the "management and control" of Hop-

per Cyprus were exercised in Cyprus. He represented that Hopper Cyprus' books and records were maintained in Cyprus and that all of its Cypriot tax returns had been duly filed. He supplied no documentary evidence to establish that board meetings took place in Cyprus or to show that "management and control" of Hopper Cyprus were exercised in Cyprus.

• Five days later, on May 18, 2016, after allegedly verifying that Hopper Cyprus had complied with its Cypriot tax return filing obligations, the Ministry issued the four residency certificates in question. Each certificate consisted of two sentences and stated that Hopper Cyprus, for 2008, 2009, 2010, and 2011, "is a resident of Cyprus within the meaning of the double taxation convention between the Republic of Cyprus and the United States of America." Each certificate bears a stamp with the name of the certifying official.

According to petitioners, these certificates establish that Hopper Cyprus for Treaty purposes was a resident of Cyprus at all relevant times. Under the act of state doctrine, petitioners contend, the determination set forth in the certificates is binding on this Court and cannot be disturbed. Respondent contends that petition-ers are not entitled to summary judgment on this point because they have not sup-plied, at this stage of the proceeding, sufficient evidence to show that the act of

state doctrine applies or that management and control of Hopper Cyprus were exercised in Cyprus. We agree with respondent.

"The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401 (1964). In Sabbatino the Supreme Court addressed a foreign sovereign's expropriation of property indirectly owned by U.S. residents. Although that act appeared to violate customary international law, the Court held:

> [T]he Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles * * * [Id. at 428.]

The act of state doctrine does not deprive a court of jurisdiction; rather, "it functions as a doctrine of abstention." Riggs Nat'l Corp. & Subs. v. Commissioner, 163 F.3d 1363, 1367 n.5 (D.C. Cir. 1999), rev'g and remanding 107 T.C. 301 (1996). The doctrine is typically invoked when a litigant claims to have been damaged by official action of a foreign Government or its officials. See, e.g., Sabbatino, 376 U.S. at 403-404 (expropriation of property); Ricaud v. Am. Metal Co., 246 U.S. 304, 310 (1918) (same); Underhill v. Hernandez, 168 U.S. 250, 254

(1897) (detention of a person by foreign official); <u>Credit Suisse v. U.S. Dist. Court for the Cent. Dist. of Calif.</u>, 130 F.3d 1342, 1347 (9th Cir. 1997) (asset freeze orders).

In such circumstances, judicial reexamination of the legality of a foreign sovereign's acts may "imperil the amicable relations between governments and vex the peace of nations." <u>Oetjen v. Central Leather Co.</u>, 246 U.S. 297, 303-304 (1918). The act of state doctrine reflects "'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs." <u>W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.</u>, 493 U.S. 400, 404 (1990) (quoting <u>Sabbatino</u>, 376 U.S. at 423)). As Chief Justice Fuller explained in <u>Underhill</u>, 168 U.S. at 252:

> [T]he courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

At the outset, respondent urges with considerable force that the act of state doctrine has no application here given the existence of a bilateral income tax treaty between the United States and Cyprus. The Supreme Court ruled in <u>Sabbatino</u> that the act of state doctrine applies "<u>in the absence</u> of a treaty or other unambiguous agreement regarding controlling legal principles." 376 U.S. at 428 (emphasis add-

ed). When two sovereigns have executed a treaty that embodies agreed-upon principles for resolving controversies, a court's application of those principles is less likely to upset sensitive diplomatic relations. Courts that have addressed this question agree that the act of state doctrine does not apply where a treaty or other binding agreement provides a controlling legal standard for a court to apply. See, e.g., Banco Nacional de Cuba v. Chem. Bank N.Y. Tr. Co., 822 F.2d 230, 234-235 (2d Cir. 1987); Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia, 729 F.2d 422, 424 (6th Cir. 1984); Foremost McKesson Inc. v. Islamic Republic of Iran, Civ. A. No. 82-0220, 1989 WL 44086, at *5-*6 (D.D.C. Apr. 18, 1989).

Here, articles 2 and 3 of the Treaty provide specific rules that govern Hopper Cyprus' residency for tax purposes. Article 3(1)(a)(i) provides that the term "resident of Cyprus" includes a "Cypriot corporation." Article 2(1)(e)(ii) provides that the term "Cypriot corporation" means "an entity (other than a United States corporation) treated as a body corporate for tax purposes under the laws of Cyprus, which is resident in Cyprus for the purpose of Cypriot tax." The Cypriot income tax law provides that the term "resident," when applied to a company, "means a company whose management and control is exercised" in Cyprus. During the Exchange of Information process, the Cypriot competent authority informed the

Department of the Treasury that Cyprus interprets "management and control" to mean "the effective management of the company."

Viewed together, these provisions supply a controlling legal standard for determining Hopper Cyprus' residency status. Under the Treaty, a corporation will be treated as a resident of Cyprus if "the effective management of the company" is exercised in Cyprus. There is no uncertainty about Cypriot law on this point, because the Cypriot competent authority specifically informed the U.S. competent authority about the legal standard it applies. And even if there were some uncertainty about Cypriot law, this Court's determination of an issue of foreign law "shall be treated as a ruling on a question of law." Rule 146.

Both parties to the Treaty presumably understood that the courts of each nation would apply the Treaty's residency rules to the facts of particular cases as they arose. Petitioners seek to limit the <u>Sabbatino</u> treaty exception to situations where the foreign sovereign's actions are <u>contrary</u> to a clearly enunciated standard set forth in a treaty. But the case law supplies no support for this limitation; as the Supreme Court stated in <u>Sabbatino</u>, 376 U.S. at 428, the question is simply whether "a treaty or other unambiguous agreement regarding controlling legal principles" exists. Given the existence of the Treaty and the absence of any dispute as

to the legal principles that control the residency issue, the act of state doctrine would appear to be inapplicable here.

Assuming arguendo that the act of state doctrine might apply, it counsels a U.S. court against deciding a case "when the outcome turns upon the legality or illegality * * * of official action by a foreign sovereign performed within its own territory." Riggs Nat'l Corp. & Subs., 163 F.3d at 1367. The party invoking the doctrine bears the burden of establishing the act and its character as an act of state. Grupo Protexa, S.A. v. All Am. Marine Slip, A Div. of Marine Office of Am. Corp., 20 F.3d 1224 (3d Cir. 1994); Republic of the Phil. v. Marcos, 806 F.2d 344, 356-357, 359-360 (2d Cir. 1986); 1 Restatement, Foreign Relations Law 3d, sec. 443, cmt. i & reporter's note 3 (1986).

The application of the act of state doctrine "depends on the likely impact on international relations that would result from judicial consideration of the foreign sovereign's act." Grupo Protexa, S.A., 20 F.3d at 1236 (quoting Allied Bank Int'l v. Banco Credito Agricola de Cartago, 757 F.2d 516, 520-521 (2d Cir. 1985)). The reviewing court must determine, on a case-by-case basis, "the extent to which in the context of a particular dispute separation of powers concerns are implicated," i.e., "whether there is evidence of a potential institutional conflict between the judicial and political branches" of the U.S. Government. Id. at 1237. "At a mini-

mum," the party invoking the doctrine must show that the foreign sovereign "acted in its sovereign capacity" and establish a "demonstrable, not a speculative, threat to the conduct of foreign relations by the political branches" of this country. Id. at 1237-1238 (first quoting Liu v. Republic of China, 892 F.2d 1419, 1432 (9th Cir. 1989); and then quoting Envtl. Tectonics v. W.S. Kirkpatrick, Inc., 847 F.2d 1052, 1061 (3d Cir. 1988), aff'd, 493 U.S. 400 (1990)). "[T]he less important the implications of an issue are for our foreign relations, the weaker [is] the justification" for invoking the act of state doctrine to require judicial abstention. Id. at 1237 (quoting Allied Bank Int'l, 757 F.2d at 521).

For several reasons we find that petitioners have not satisfied their burden to show that the act of state doctrine applies. To begin with, we question whether the issuance of the residency certificates rises to the level of an "act of state." The certificates were issued five days after the application was filed. The application consisted of unsubstantiated representations by a Hopper Cyprus director, who checked "yes" boxes on the application form. Apart from confirming the filing of tax returns--Hopper Cyprus' returns for 2008-2011 were submitted the day before the application, they were at least four years late, and two of them were unsigned--there is no evidence that the Ministry verified any of the applicant's factual representations.

"The act of state doctrine 'does not bestow a blank-check immunity upon all conduct blessed with some imprimatur of a foreign government.'" Gross v. German Found. Indus. Initiative, 456 F.3d 363, 392 (3d Cir. 2006) (quoting Timberlane Lumber Co. v. Bank of Am., 549 F.2d 597, 606 (9th Cir. 1976)). The courts have held, for example, that the act of state doctrine does not apply to a foreign Government's grant of a patent. Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1294 (3d Cir. 1979); cf. Williams v. Curtiss-Wright Corp., 694 F.2d 300 (3d Cir. 1982) (declining to apply act of state doctrine to foreign government's refusal to purchase aircraft parts from a particular supplier); Forbo-Giubiasco SA v. Congoleum Corp., 516 F. Supp. 1210, 1217 (S.D.N.Y. 1981). On the facts here, the issuance of the residency certificates appears to have been a clerical act analogous to (and arguably less substantive than) the grant of a patent. Petitioners have failed to show that this action rises to the level of an "act of state."[9]

---

[9]Petitioners allege that IRS, when issuing a Form 6166, Certification of U.S. Tax Residency, follows a process similar to that followed by Cyprus. We do not see the logic of this argument. The question we are deciding is whether Cyprus performed an official act of state in certifying Hopper Cyprus' residency. Whether the IRS follows a similar process for taxpayers who seek certification of residency does not bear on this question.

Nor have petitioners shown that failure to give binding effect to the residency certificates would pose a "demonstrable, not a speculative, threat to the conduct of foreign relations by the political branches of the United States government." Grupo Protexa, S.A., 20 F.3d at 1238. As far as the record reveals, the clerk who issued the residency certificates was discharging a routine task. Petitioners have supplied no evidence that this act reflected "a considered policy determination" by the Cypriot Government "to give effect to its political and public interests [in] matters that would have [a] significant impact on American foreign relations." Mannington Mills, Inc., 595 F.2d at 1294 (refusing to apply act of state doctrine to foreign Government's grant of patent rights because judicial review posed no threat to diplomatic relations).[10]

In assessing the effect of the certificates, moreover, we are not ruling on "the legality or illegality * * * of official action by a foreign sovereign." See

_____

[10]Petitioners view the Supreme Court's opinion in W.S. Kirkpatrick & Co. as suggesting that diplomatic concerns need not be implicated in order for the act of state doctrine to apply. Petitioners' view is incorrect. The Supreme Court in that case rejected the doctrine's application "because the validity of no foreign sovereign act [wa]s at issue." 493 U.S. at 410. The Court reached that conclusion even though the litigation might have affected U.S. foreign policy by embarrassing a foreign Government. See id. at 408. The Court simply held that the presence of diplomatic concerns, in and of itself, is not sufficient to require application of the act of state doctrine. The Court did not hold that the doctrine applies even where such concerns are absent. Indeed, because the Court rejected the doctrine's application, it could not possibly have made any such holding.

Riggs Nat'l Corp. & Subs., 163 F.3d at 1367. Nor are we "inquiring into the validity of the public acts" of a foreign Government. See Sabbatino, 376 U.S. at 401. There is no dispute concerning the legal standard that governs whether Hopper Cyprus was a Cypriot resident under the Treaty. See supra pp. 35-36. The certificates reflect the Ministry's opinion as to how that standard applies to the particular set of facts involved here. In declining to give that opinion dispositive effect for U.S. tax purposes, we are not questioning the validity or legality of the Ministry's action.

In urging that the act of state doctrine applies here, petitioners rely chiefly on the opinion of the U.S. Court of Appeals for the D.C. Circuit in Riggs Nat'l Corp. There, the taxpayer's subsidiary, a U.S. bank, had made loans to the Central Bank of Brazil as part of an international effort to prevent Brazil from defaulting on its sovereign debt. See Riggs Nat'l Corp. & Subs., 163 F.3d at 1363-1364. These loans were structured as "net loans," whereby the Central Bank paid Brazilian tax on the interest and remitted the interest on a net basis to the taxpayer. Ibid.

The taxpayer claimed an FTC for the Brazilian taxes thus paid, taking the position that it bore the economic cost of the Brazilian tax the Central Bank had paid on its behalf. The IRS disallowed the claimed credit, determining that the

Brazilian tax payments were "voluntary." See sec. 901(b); sec. 1.901-2(a)(2)(i), Income Tax Regs. That was assertedly so because the Central Bank, as a component of the Brazilian Government, was a "tax-immune borrower" that had no obligation to pay Brazilian tax. See Riggs Nat'l Corp. & Subs., 163 F.3d at 1367.

The dispute in Riggs Nat'l Corp. focused on the effect of a ruling by the Brazilian Minister of Finance, "the highest ranking Brazilian authority on tax matters." Id. at 1366. That ruling concluded that "the Central Bank--notwithstanding its tax-immune status--was required under Brazilian law to pay the tax obligation assumed from lenders" on the net loan transactions. Ibid. The taxpayer contended that the act of state doctrine required U.S. courts to give effect to this ruling, thus establishing that the Brazilian tax had not been paid "voluntarily."

The Commissioner urged on appeal that "a foreign administrative official's interpretation of foreign law is not the type of act of state contemplated by the doctrine." Id. at 1367. The D.C. Circuit acknowledged that the act of state doctrine has typically been applied where a party alleged injury from some "tangible" act of a foreign sovereign, such as an expropriation of assets, a physical detention, or an asset freeze order. See id. at 1367-1368. The court indicated that it was "unaware of cases treating an interpretation of law as an act of state." Id. at 1368. And it said that it would be "hesitant to treat an interpretation of law as an act of

state, for such a view might be in tension with rules of procedure directing U.S. courts to conduct a <u>de novo</u> review * * * when an issue of foreign law is raised." <u>Ibid.</u> (citing Rule 146 and Fed. R. Civ. P. 44.1).

As its basis for holding that the act of state doctrine nevertheless applied, the D.C. Circuit determined that "the Minister's order to the Central Bank to withhold and pay the income tax * * * goes beyond a mere interpretation of law." <u>Id.</u> at 1368. The Finance Minister had explicitly "ordered that the Central Bank 'must * * * pay the income tax on the interest.'" <u>Ibid.</u> (quoting <u>Riggs Nat'l Corp. & Subs.</u>, 107 T.C. at 331). The court analogized the Finance Minister's order to asset freeze and currency control orders, which the courts had previously treated as acts of state. <u>See</u> <u>ibid.</u> Any other conclusion, the Court of Appeals ruled, would effectively declare "'non-compulsory,' <u>i.e.</u>, invalid, the Minister's order to the Central Bank to pay the taxes." <u>Ibid.</u> "The act of state doctrine," the court concluded, "requires courts to abstain from even engaging in such an inquiry." <u>Ibid.</u>

For at least two reasons, petitioners' reliance on <u>Riggs Nat'l Corp.</u> is misplaced. First, the D.C. Circuit applied the act of state doctrine because it concluded that the Finance Minister's ruling was not a mere interpretation of law, but rather was a binding order that compelled action by the Central Bank, a compo-

nent of the Brazilian Government. In issuing the residency certificates, by contrast, the Cypriot Ministry was simply offering an interpretation of law, expressing its view as to how the Treaty's residency provisions apply to a particular set of facts. The certificates are purely retrospective, relating as they do to Hopper Cyprus' 2008-2011 tax years. The Ministry issued no order to any entity (governmental or otherwise), and the certificates have no binding prospective effect on anyone.

Second, the D.C. Circuit applied the act of state doctrine because it concluded that failing to do so would effectively declare the Finance Minister's order "invalid." Riggs Nat'l Corp. & Subs., 163 F.3d at 1368. In assessing the effect of the residency certificates, by contrast, we are not ruling on "the legality or illegality * * * of official action by a foreign sovereign." See id. at 1367. We do not question the validity of the certificates or whether they were properly issued in accordance with the Ministry's procedures. Because we are not second-guessing the legality of the Ministry's action, "the validity of no foreign sovereign act is at issue" in this case. See W.S. Kirkpatrick & Co., 493 U.S. at 410.

In considering petitioners' motion for partial summary judgment on this question, we must view all facts and inferences drawn from them in the light most favorable to respondent, the nonmoving party. See Dahlstrom, 85 T.C. at 821.

Applying that standard, we conclude that petitioners are not entitled to summary judgment on the question whether Hopper Cyprus during 2009 was a "qualified foreign corporation" within the meaning of section 1(h)(11)(B)(i)(II). The answer to that question depends (in part) on whether Hopper Cyprus was a resident of Cyprus under the Treaty. The residency certificates issued by the Ministry are relevant to that inquiry; to the extent those certificates are based on sound reasoning and accurate factual representations, they will be accorded (at the least) appropriate weight. But viewing all facts and inferences in the light most favorable to respondent, we hold that petitioners have not established that the act of state doctrine applies here, such that we are required, at this stage of the case, to accord those certificates dispositive effect.

### C.    2009 Constructive Dividend

The third issue is whether petitioners must include in gross income for 2009 a constructive dividend of $21,055,123 from Hopper Cyprus. Beginning as early as 1999, Memcorp HK held an open account receivable from Hopper US on which Hopper US was indisputably liable. The balance of this account reached its zenith in 2005, when it stood at $64,911,625, and declined thereafter. When Memcorp HK reorganized itself to Cyprus, Hopper Cyprus became the obligee on this account receivable. On March 31, 2009, when the account had an outstanding bal-

ance of $21,055,123, Hopper Cyprus wrote off the entire balance, reducing the indebtedness of Hopper US to zero. Invoking sections 301(c)(1) and 316, respondent contends that petitioners in consequence received a constructive dividend of $21,055,123.

A dividend may be formally declared, or it may be constructive. See Boulware, 552 U.S. at 429-430; Truesdell, 89 T.C. at 1295. A constructive dividend is an economic benefit conferred upon a shareholder by a corporation without an expectation of repayment. Truesdell, 89 T.C. at 1295 (citing Noble, 368 F.2d at 443). When a corporation cancels its shareholder's debt without consideration, the cancellation is generally treated as a distribution to the shareholder, which will constitute a dividend to the extent of the corporation's E&P. See secs. 61(a)(12), 301(a), (c)(1); United States v. Kirby Lumber Co., 284 U.S. 1 (1931); Shephard v. Commissioner, 340 F.2d 27 (6th Cir. 1965), aff'g T.C. Memo. 1963-294; Haber v. Commissioner, 52 T.C. 255, 262 (1969), aff'd, 422 F.2d 198 (5th Cir. 1970); sec. 1.301-1(m), Income Tax Regs. ("The cancellation of indebtedness of a shareholder by a corporation shall be treated as a distribution of property."). These rules apply to distributions from both domestic and foreign corporations.

"The notions of constructive dividend and cancellation of indebtedness merge" in this setting. Midwest Stainless, Inc. v. Commissioner, T.C. Memo.

2000-314, 80 T.C.M. (CCH) 472, 476. A constructive dividend involves "the conferring of an economic benefit without expectation of repayment," and the cancellation confers upon the shareholder a definite economic benefit "when it becomes clear that the debt will not have to be repaid." Ibid. (citing Waterhouse v. Commissioner, T.C. Memo. 1994-467; and then citing Cozzi v. Commissioner, 88 T.C. 435 (1987)).

Citing these principles, respondent contends that Hopper Cyprus' cancellation of the $21,055,123 debt constituted a constructive distribution through Hopper US to petitioners. He further argues that this distribution was taxable under section 301(c)(1) as a dividend, to the extent that Hopper Cyprus had sufficient E&P. Petitioners do not dispute that Hopper Cyprus had accumulated E&P in excess of $21,055,123 in 2009. And they do not contend that these E&P were previously included in their gross income.

In reply petitioners advance what seems to be a statute of limitations argument blended with a double-taxation argument. Both arguments have their roots in the IRS' examination of petitioners' 2004 and 2005 returns. During that examination the IRS determined that Memcorp HK's account receivable constituted an investment in U.S. property within the meaning of section 956(a) and (c)(1)(C). The IRS accordingly made adjustments that required petitioners to include in gross

income, for 2004 and 2005, $15,765,803 and $2,612,877, respectively.[11]  Petitioners acquiesced in these adjustments and made section 962 elections as described above.  See supra pp. 8-10, 17-19.

Noting that Memcorp HK's account receivable balance peaked at $64.9 million in 2005, petitioners contend that their CFCs made no additional investments in U.S. property after that year.  According to petitioners, therefore, the IRS was obligated to make any section 956(a) inclusions when it examined their returns for 2004 and 2005.  Because the period of limitations for 2004 and 2005 has now lapsed, see sec. 6501(a), petitioners assert that the IRS cannot make any more section 956(a) inclusions now and cannot pursue an alternative theory--i.e., its constructive dividend theory--to tax them when the debt was canceled in 2009.

Petitioners note that Memcorp HK's account receivable triggered constructive income inclusions to them in 2004 and 2005, whereby the IRS treated E&P corresponding to a portion of that account as an investment in U.S. property.

---

[11]Respondent represents that he erroneously computed (and substantially understated) petitioners' gross income inclusions for 2004 and 2005 by applying an earlier version of section 956 that existed before its amendment in 1993.  See infra p. 50.  For purposes of our present inquiry, the amount of previous section 951(a) inclusions is not relevant, except to the extent that these inclusions gave rise to previously taxed E&P under section 959.  Section 959(a)(1) does not allow petitioners to exclude from gross income amounts that could have been, but were not in fact, previously included in gross income under sections 956(a) and 951(a)(1)(B).

From that premise petitioners conclude that the IRS is subjecting them to double taxation by treating as gross income the cancellation of the remaining debt. Petitioners' theory appears to be that the entire account receivable balance was constructively distributed to them in 2004 and 2005 and that this debt cannot give rise to another constructive distribution in 2009.

Petitioners' argument misses the mark for several reasons. Their critical error is their assumption that the IRS was required to make any and all section 956(a) inclusions for 2004 and 2005, the years for which the IRS evidently first discovered that Memcorp HK had made an investment in U.S. property. There is no support for that assumption in the Code, the regulations, or judicial precedent.

Congress provided that the section 956 inclusion "for any taxable year" shall be determined by measuring the average amount of U.S. property held by a CFC "as of the close of each quarter of such taxable year." Sec. 956(a) (flush language); id. para (1)(A). The statute does not require that the inclusion be made for the first year in which the CFC acquires its investment or that the inclusion be made for any particular year. See Crestek, Inc. & Subs. v. Commissioner, 149 T.C. __, __ (slip op. at 17) (July 27, 2017). To the contrary: The statute defines the inclusion for any particular year by reference to "the amounts of United States property held (directly or indirectly) by the controlled foreign corporation" during

that year.  Sec. 956(a)(1)(A) (emphasis added).  Thus, where a CFC holds an item of U.S. property for multiple years--as Memcorp HK and Hopper Cyprus did-- section 956(a) permits an inclusion in income for any one of those years.  Crestek, Inc. & Subs., 149 T.C. at __ (slip op. at 17).

"The only relevant limitation is that a section 956 inclusion cannot be made more than once for any particular investment by a CFC in United States property." Ibid.  Congress accomplished this limitation by providing that any inclusion under section 956 must be reduced by previously taxed income (PTI) under section 959(c)(1)(A).  Petitioners have stipulated that the PTI limitation does not apply here because no portion of the E&P attributable to the $21,055,123 debt cancellation was previously included in their gross income under subpart F.

Petitioners likewise err in contending that the IRS can make a section 956 adjustment only for a year in which the CFC's investment in U.S. property increases, using a year-by-year approach.  For this proposition they cite McCulloch Corp. v. Commissioner, T.C. Memo. 1984-422, 48 T.C.M. (CCH) 802.  But the Court there was applying an earlier version of section 956(a), which was in effect before Congress amended the statute to its current form in 1993.  See Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, sec. 13232(a), 107 Stat. at 501.  As in effect before 1993, former section 956(a)(2) determined the U.S.

shareholder's section 951(a) inclusion by reference to "the increase" of a CFC's earnings invested in U.S. property. For the tax years at issue here, section 956(a) determined that inclusion, as noted above, by reference to the amount of U.S. property "held" by the CFC, to the extent it exceeds PTI.

In short, the IRS was not required to make any and all section 956(a) inclusions relating to Memcorp HK's investment in U.S. property during its examination of petitioners' 2004 and 2005 tax years. That being so, petitioners' statute of limitations argument collapses. The fact that the period of limitations has expired for 2004 and 2005 has no relevance in determining whether they received a constructive dividend when Hopper Cyprus canceled their indebtedness in 2009.

Despite the section 956(a) inclusions for 2004 and 2005, Memcorp HK continued to hold a very large debt obligation from Hopper US and that debt obligation remained at all times an investment in U.S. property. The IRS was free to make additional section 956(a) adjustments for later years, to the extent permitted by the statute. And when Hopper Cyprus canceled that debt on March 31, 2009, the IRS was free to treat petitioners as having received a constructive distribution of $21,055,123, the balance of the account on that date.

Respondent has acknowledged that, for 2004 and 2005, he understated petitioners' section 956(a) inclusions attributable to Memcorp HK's investment in

U.S. property.  See supra p. 47 n.11.  Petitioners repeatedly contend that the IRS, having allegedly failed to tax them properly in 2004 and 2005, should not be given "a second bite at the apple" when Hopper Cyprus canceled the debt in 2009.  Once again, the results of the 2004 and 2005 examination are irrelevant here.  Petitioners concede that Hopper Cyprus had accumulated E&P in excess of $21,055,123 when it canceled the debt.  And petitioners have admitted that the E&P attributable to this writeoff, which were not previously included in Hopper US' gross income under section 951, constitute previously untaxed E&P under section 959(c)(3).  Absent any override by section 959, the writeoff is properly treated as a constructive dividend to Hopper US, as would be the case if this were an entirely domestic arrangement.

Petitioners likewise err in asserting that the IRS has taken a "fundamentally inconsistent position" by determining a constructive dividend for 2009.  The section 956(a) inclusions for 2004 and 2005 and the debt cancellation in 2009 are separate taxable events, each with its own prescribed tax treatment.  By virtue of the 2004 and 2005 inclusions, petitioners were taxed on $18,378,680 of E&P that Memcorp HK had accumulated by that time.  By virtue of Hopper Cyprus' cancellation of the account receivable in 2009, petitioners realized a $21,055,123 accession to wealth.  That accession to wealth was taxable to petitioners as a construc-

tive dividend because Hopper Cyprus in 2009 had accumulated E&P in excess of $21,055,123, no portion of which had previously been included in petitioners' gross income.

Finally, there is no legal basis for petitioners' assertion that Memcorp HK's account receivable balance was constructively distributed to them, in its entirety, when $18,378,680 was included in their gross income for 2004 and 2005. Petitioners cite various authorities for the proposition that income constructively received in year 1 cannot be taxed again when actually received in year 2. But while that proposition is generally correct, the premise for petitioners' argument is not. To begin with, the prior section 956 inclusions were not "constructive distributions." See SIH Partners LLLP v. Commissioner, 150 T.C. __, __ (slip op. at 52-53) (Jan. 18, 2018) (holding that inclusions under section 956(d) for guaranties by CFCs do not constitute dividends); Rodriguez v. Commissioner, 137 T.C. 174 (2011), aff'd, 722 F.3d 306 (5th Cir. 2013). In any event, there is no legal basis for petitioners' assertion that the entire account receivable balance was constructively distributed to them in 2004 and 2005 when E&P corresponding to a portion of it (i.e., $18,378,680) was included in their gross income.

For these reasons, we conclude that petitioners in 2009 received from Hopper Cyprus a constructive distribution of $21,055,123 and that this distribution

was taxable to them in full as a dividend under sections 301(c)(1) and 316(a).  We will therefore grant respondent's cross-motion for partial summary judgment on this point.[12]

To implement the foregoing,

<u>An order will be issued granting respondent's motion for partial summary judgment, denying petitioners' cross-motion for partial summary judgment, and denying petitioners' motion for partial summary judgment.</u>

---

[12]In his cross-motion for partial summary judgment respondent contends that this constructive dividend does not constitute QDI taxable at preferential rates under section 1(h)(1).  That depends on whether constructive dividends can constitute "qualified dividend income" under section 1(h)(11)(B) and on whether Hopper Cyprus during 2009 was a "qualified foreign corporation" under section 1(h)(11)(B)(i)(II).  The parties have not addressed the first point and (as noted above) we find that petitioner is not entitled to summary judgment on the second. See supra pp. 27-44.  We accordingly leave resolution of these questions to further proceedings.  Cf. Luczaj & Assocs. v. Commissioner, T.C. Memo. 2017-42, 113 T.C.M. (CCH) 1187, 1193 n.3.